## Gaines *versus* The Commonwealth.

*Contradiction of witness cross-examined as to collateral matters on trial for murder.—Exclusion of evidence in rebuttal which should have been offered in chief.—Right of jury to decide without scientific analysis as to whether a certain substance called blood is or is not blood.*

1. Where a witness is cross-examined as to matter collateral to the issue, evidence cannot be afterwards adduced to contradict him: his answer is conclusive upon the party so cross-examining.

2. But where, on a trial for murder, the witness was asked, on cross-examination, whether he had made certain threats against the murdered man, which he denied, evidence that he had made the threats was admissible, as having a direct bearing to show the motives operating upon his mind, which were material, and to impugn his testimony.

3. It is in the discretion of the court to admit or overrule evidence offered in rebuttal, which might have been given in chief.

[Gaines *v.* The Commonwealth.]

4. It is not error in the court to refer the question to the jury whether a certain substance supposed to be blood is really blood; and to refuse the instruction, that because there has been no chemical test or microscopic examination, they were bound to reject the evidence offered as insufficient to show that the spots seen by the witnesses were blood.

ERROR to the Court of Oyer and Terminer of *Clinton county.*

William Gaines was indicted for the murder of his brother Robert Gaines, at December Session 1863, and arraigned for trial at February Session 1864.

That Robert Gaines had been murdered was clear, but the testimony on the part of the Commonwealth as to the guilt of the defendant was altogether circumstantial.

The trial commenced on the 10th of February, and closed on the 21st of February.

The material facts, as given in evidence, were as follows:—

It appeared that the two brothers, William and Robert, had a difficulty about some timber, which resulted in a lawsuit, and which was still undetermined in July 1863. On the 12th of July Robert went over to William's, and invited him to come to his house the next day to take a deer-hunt, and see to if they could not settle their money matters. William went over that evening, and next morning, in company with Absalom Smoke, an illegitimate son of Robert's, started on a deer-hunt. Their dogs failing to start any deer, they both returned to Robert's house about noon. After dinner all the parties present, consisting of Absalom Smoke, William and Robert Gaines, and Mary Gaines, Robert's wife, went to work in a corn-field near Robert's house. Several times during the afternoon Robert invited William to the house to drink with him. Shortly before supper-time, they went in together for the purpose of settling their accounts, in which they succeeded, finding a balance of some sixty-odd dollars due William. When the settlement was concluded they both came out of the house. Robert then went into a bed-room for the ostensible purpose of getting the money to pay his brother. In a few moments, however, he returned with a large butcher-knife, and said to William that he had much rather fight him than pay him. William replied that he had no wish to fight at all, and besides Robert had a knife and would not fight fairly. Upon this Robert made an assault upon William, striking at him furiously and repeatedly with the butcher-knife, and inflicting several serious wounds upon him, one of which was on the chin and bled profusely. As William was retreating and attempting to parry the blows given with the knife by his brother, Robert succeeded in getting hold of a hilling-hoe, with which he struck William twice or three times, knocking him down. William finally succeeded in making his escape, and ran through the fields towards the road leading to his own house. While Robert was following William through the

[Gaines v. The Commonwealth.]

fields threatening to take his life, Absalom Smoke went to the house, took William's gun and carpet-bag to the place where William would come into the road. When Robert ascertained this he threatened him for what he had done.

After William had passed into the road from the fields, Robert came up near him and requested him to go back to the house and get the remainder of his things, consisting of a dog-chain and a bottle of whiskey. William said he was afraid Robert would fall on him again and abuse him if he went back. Robert promised that he should not be further molested. They then both returned to the house. After William had received the articles belonging to him, Robert renewed the proposition to fight out their difficulty. William replied that he could not fight, as he was bleeding so badly. Robert then said if William did not leave the premises immediately he would make him bleed more. Upon this William took his things and left, but no one saw in what direction he went. According to the testimony of the wife of the deceased, at no time during this entire difficulty did William make any threats against Robert, nor attempt in any wise to do him injury, nor exhibit any feelings of malevolence or revenge towards him. And from the testimony of many neighbours called, he was shown to be a quiet, peaceable, good-natured, inoffensive man; while on the other hand, it appeared from the testimony, that Robert was quarrelsome, malicious, vindictive, and revengeful.

After William left the house, supper was prepared and placed on the table, and Robert and the family sat down to eat—Robert sitting opposite to and facing a window. During the meal, Robert told his family, that when he had finished his supper he would take his gun and follow William, and that with the load he had that day put into his gun he would kill William, or John Gaines, another brother with whom he had had some difficulty. Before he had finished his supper, however, a shot was fired through the window, the ball taking effect in the breast of Robert and causing almost instant death. No one saw who fired the shot, although it was so close to the window that the flash of the gun lit up the room, and the burnt powder blackened the window-frame. From the nature of the ground, as testified by all the witnesses, the person discharging the gun must have stood within eight or ten feet of the window when the shot was fired. The ball passed entirely through Robert's body, and through a board partition, and was found in an adjoining room.

After Absalom Smoke left Robert's house with William's gun and carpet-bag, nothing was seen nor heard of him until just before dark, when he stopped at John Condon's, about half a mile from Robert's, and asked to borrow his (Condon's) gun, for the purpose, as he alleged, of defending himself, as he was afraid Robert would follow him up and shoot him, owing to the difficulty

14 Wr.—21

they had had in consequence of his carrying William's things to him. Condon refused to let him have it. After a great deal of importunity and promises on the part of Smoke that he would go directly home in an opposite direction from Robert's, he obtained the gun and shot-pouch. Condon and his wife both watched him to see that he kept his promise of going home. He started in that direction and went to the end of their fields, when he passed out of their sight—about eighty or one hundred yards from their house. Something like half an hour after Smoke left Condon's, Mrs. Condon heard the report of a gun in the direction of Robert Gaines's, which corresponded very accurately with the time that Robert was shot. Late in the evening, after the families had retired for the night, Absalom Smoke went to the houses of John Maines, George Rohn, and Robert Dunlap, living close together, about three-quarters of a mile from John Condon's. He called these men up, and asked them to go down the road and help William Gaines up, as Robert had stabbed him, and he was afraid William would bleed to death. They agreed to go, but requested Smoke to return with them and show them where William was. This Smoke refused to do, on the ground that he was afraid of Robert, and started on his way home in an opposite direction.

Having procured a torch-light, Maines, Rohn, and Dunlap started down the road to find and assist William Gaines. They found him coming up the mountain, in the road above where it is intersected by the path leading from Robert's house, using his gun as a cane to assist himself along. He was bleeding profusely, very weak and exhausted, and apparently considerably under the influence of liquor. The breech of his gun was somewhat bruised, the lid of the patch-box twisted, and the ramrod partially out of the thimbles. One of the party took the gun, and with some difficulty he was assisted up to the house of Condon, where his wounds were dressed. Some of the party here discovered that the gun had a bursted cap upon it, and William gave him a fresh one to put on. No examination was made to ascertain whether the gun was loaded or not. Absalom Smoke testified that he had shot the gun off that afternoon at a mark, but stated also that he remembered distinctly of loading it again, and putting on a fresh cap.

After the wounds of William had been dressed, he had become refreshed, and furnished with a light, he started on his way home by himself. When he reached his sister's, Susan Smoke's, she sent her son James with him to assist him home. They reached William's house, and he sent James Smoke to the field for a horse, for the purpose of going to Henry C. Kaylor's, a justice of the peace, who lived some distance, in order to obtain a warrant for Robert's arrest, for the assault with intent to kill which Robert had committed upon him. The horse was brought, and William, in company with two nephews, started for the justice. When

within a few rods of the house they met William Smoke, who informed them of Robert's death; whereupon the party all turned back and proceeded to the house of Absalom Smoke.

The next day an inquest was held on the body of the deceased by Justice Kaylor. No measurement was made of tracks found in the cornfield, which they supposed were the tracks of the murderer; marks of blood which some of the jurors believed they saw upon an apple-tree and upon the growing corn were not observed by others present, and were not carefully and critically examined by any one. No blood was found in front of the window where the murderer must have stood when he fired the fatal shot.

The jury found that the deceased came to his death by a shot fired by some person unknown to them, and seemed contented to inquire no further. No warrant was issued for the apprehension of William, or any one else, for months. Upon the trial none of the guns mentioned, Robert's, William's, or John Condon's, were produced, nor any effort made to show that the ball found by the inquest, and alleged to have been the instrument of death, corresponded in weight with the balls of any of these guns.

Absalom Smoke was the principal witness for the Commonwealth. He testified that William, after leaving the field, had received his gun, and had offered him money to get possession of it. That after getting it he swore he would not leave the place without satisfaction; and many other circumstances tending to show a malicious disposition on the part of William toward Robert. Upon cross-examination he denied ever having any difficulty of any kind with Robert, or ever entertaining any evil designs towards him. He denied having told to Condon and the men he sent for William Gaines that he and Robert had a difficulty, and he was afraid Robert would follow him and kill him. He furthermore denied having ever told any one that Robert had illicit intercourse with his (Absalom's) wife, and that he would watch his opportunity to take his revenge. He denied having said to any one before the murder that he would take Robert's life, or afterwards that he had done so.

Under the charge of the court there was a verdict of guilty of murder in the first degree.

Motions for a new trial and in arrest of judgment were made, argued, and overruled; judgment entered on the verdict, and the prisoner sentenced to be hanged.

This writ was then sued out for the prisoner, for whom the following errors were assigned:—

1. The court erred in rejecting the evidence offered by the defendant below, which offer was as follows:—

"Susan Smoke, the witness under examination, being on the stand, defendant's counsel propose to ask her, for the purpose of contradicting and discrediting Absalom Smoke, what he told her

[Gaines v. The Commonwealth.]

shortly prior to the death of Robert Gaines in relation to illicit intercourse between Robert Gaines and his wife Naomi, and in relation to what he (Absalom Smoke) had determined to do to Robert Gaines in consequence thereof."

The Commonwealth objected to the admission of this evidence for the following reasons:—

1. Because as Absalom Smoke was cross-examined as to collateral matters, his answer was therefore conclusive on the defendant, and he cannot be contradicted.

2. Because the motive and feelings of Absalom Smoke towards the deceased would only be evidence were he on his trial for the offence charged against William Gaines.

3. The evidence is not competent to exculpate the prisoner, by throwing the guilt of the crime upon Absalom Smoke, by proving his motives and feelings towards the deceased.

4. The evidence, if admitted, would not discredit the witness Absalom Smoke, as to his relation of facts and circumstances implicating the prisoner.

The offer was held inadmissible for the reason stated in the first objection above set forth.

2. The court erred in admitting the evidence offered by the Commonwealth, which offer was as follows:—

" Commonwealth proposes to prove by John Rohn that Susan Potter had a conversation with him in relation to the trial of William Gaines, in which she inquired of him what they could prove against William Gaines."

Defendant's counsel objected to the above offer, because wholly irrelevant to the issue trying.

Admitted for the purpose of showing the feeling of the witness.

3. The court erred in admitting the evidence offered by the Commonwealth, which offer was as follows:—

" The Commonwealth proposes to prove by John Condon, the witness, that Absalom Smoke returned the gun next morning which he had borrowed the evening before. That the gun was in the same condition when it was returned as when Absalom Smoke took it.

" That the shot-pouch contained the same number of bullets that were in it when taken by Absalom Smoke the evening before. That the gun had been loaded some time before by the witness, and that when returned by said Absalom Smoke it had not been discharged."

Defendant's counsel objected to the admission of the evidence offered, for the following reasons:—

1. Because, if evidence at all pertinent to the issue, it was evidence in chief, and of the same character as the fact so carefully proven by the Commonwealth in chief, that Absalom Smoke, on

[Gaines *v.* The Commonwealth.]

leaving Condon's house, started in the direction of John Maines's house, and not in the direction of Robert Gaines's house.

2. Because the Commonwealth had already offered evidence that the gun and shot-pouch were taken back to Condon's the next day after they were borrowed, and could then have not only called Condon to the same fact, but to the condition of the gun, shot-pouch, &c., as now offered.

The court regarded this offer as coming within the rule of law admitting rebutting evidence, and therefore considering it competent testimony, irrespective of that discretion which the court may exercise in the order of admitting evidence, overruled the objections of the defendant and admitted the offer.

4. The court erred in that part of their charge to the jury which was as follows :—

" If the witnesses who have testified on the subject could not by the examination which they made, ascertain with certainty whether what they supposed to be blood was really blood, then the proof falls short of the requirements of the law ; but we cannot instruct you that because no analysis has been made of the substance which the witnesses supposed to be blood—no chemical test, nor microscopic examination—that therefore you are to reject the evidence as insufficient to show that it was blood. We feel it to be our duty to refer the question to you, and leave it to you to say whether the Commonwealth has satisfied you beyond a reasonable doubt that the spots seen by the witnesses were blood."

*John H. Orvis, S. R. Peale,* and *H. N. McAllister,* for plaintiff in error.

*G. O. Deise* (with whom were *Mayer & Ball*), for the Commonwealth.

The opinion of the court was delivered, October 20th 1864, by

STRONG, J.—This case has been argued with great zeal and ability on behalf of the plaintiff in error, and for the Commonwealth with much candour and fairness. Assisted by the argument we have carefully reviewed the record, and have come to the conclusion that but one of the assignments of error can be sustained.

William Gaines, the defendant below, now plaintiff in error, was indicted for the murder of Robert Gaines. That the deceased had been murdered was not controverted at the trial. The thing in contest was whether the defendant was the person who had perpetrated the crime. That he was, the Commonwealth sought to establish, not by direct evidence, but by proof of circumstances inconsistent with any other reasonable hypothesis. To the existence of some of these circumstances, one Absalom Smoke was called to testify, and, as preparatory to an assault on his credi-

[Gaines *v.* The Commonwealth.]

bility, he was asked on cross-examination whether, in a conversation with Susan Potter, shortly before the death of Robert Gaines, he had not complained of illicit intercourse between Robert Gaines and his (the witness's) wife, and whether he had not stated that he would watch his opportunity to catch Gaines in the act, and take his revenge. In answer to this question he denied having had any such conversation with Susan Potter, and declared that he did not recollect ever saying anything to her, *or to anybody else,* about Gaines having intercourse with his wife. When the evidence in chief for the Commonwealth was closed, Susan Potter was called by the defendant, and she testified that Absalom Smoke had made to her the complaints and had uttered the threats which he had disavowed on his cross-examination. It was then proposed to follow this evidence by the testimony of one Susan Smoke, that he had made similar declaration to her. The offer was made avowedly for the purpose of contradicting and discrediting him. Several objections were made to it, and the offer was overruled by the court. The reason assigned for its rejection was, that " as Absalom Smoke had been cross-examined as to collateral matter, his answer was conclusive on the defendant and could not be contradicted." It is very necessary to a correct decision of the question whether the court was right in overruling this offer, that the avowed purpose for which the evidence was submitted should be kept steadily in view. To that the plaintiff in error must be confined. The relevancy of the evidence to the issue, had it been offered generally, need neither be affirmed nor denied. A party cannot offer evidence for a specified purpose, and complain when it has been rejected that it was legitimate for another and distinct object. In Carpenter *v.* Wall, 11 A. & E. 803, it was ruled that where evidence had been offered in contradiction of a witness which was inadmissible, because the witness had not been cross-examined particularly respecting the matter, it was not error to reject it, though it would have been competent generally in the cause. Here Susan Smoke's testimony was tendered to show that Absalom Smoke had testified to what was untrue, and to discredit him generally, not to prove that he was himself the murderer. The question, therefore, is not whether the fact that he made complaints of Robert Gaines and threatened to be revenged was admissible in evidence for any purpose, but whether it was competent as a means of impeaching his testimony. If it was collateral to the issue, the court was right in overruling the offer of Susan Smoke's testimony, for the rule is settled that a witness may not be cross-examined as to a distinct collateral fact for the purpose of afterwards impeaching his testimony by contradicting him: 1 Stark. Ev. 134–5. The same writer asserts the doctrine, that should such questions be answered, evidence cannot afterwards be adduced for the purpose of contradiction. He adds that the same

rule obtains if a question as to a collateral fact be put for the purpose of discrediting his testimony : " his answer must be taken as conclusive, and no evidence can afterwards be admitted to contradict it."

Now that the proposed testimony of Susan Smoke was to some extent contradictory to the. answer made by Absalom Smoke to the question put to him on his cross-examination, is manifest. In his answer he denied any recollection of having made to Susan Potter, *or anybody else*, such complaints or threats as the rejected witness was called to prove he had made. Was, then, the fact that he had made such statements and threats immaterial and collateral ? The court below thought it was, and therefore refused to permit Susan Smoke to contradict him. In this we think there was error. Throwing out of consideration the inquiry, as not raised by the record, whether the fact was not pertinent, as an independent circumstance, tending to show that some other than the defendant, to wit, Smoke himself, had perpetrated the murder, had it not a direct bearing upon the motives operating upon the mind of Absalom Smoke when he testified ? It surely had a tendency to show ill feeling in him towards the deceased. It would have been a circumstance to be considered, had the question been directly whether he was guilty of the murder, especially when taken in connection with other evidence which had been given. It furnished an additional ground of suspicion, though it may have been slight, that he might have had something to do with the crime, perpetrated as it was by an unseen hand. All this he must have known. And if so, he must have testified with the knowledge that there were suspicious circumstances pointing more or less distinctly at him. Was this no motive to make the case as strong as possible against another, and thus divert suspicion from himself ? The motives which operate upon the mind of a witness when he testifies are never regarded as immaterial or collateral matters. They may, therefore, be proved: 1 Whart. Crim. Law, 5th ed., § 817 ; People *v.* Austin, 1 Parker's C. C. R. 154. It is for this reason that the feelings of a witness towards one of the parties to an issue may be proved. Partiality and hostility are no more cogent motives to untruthfulness than is the common and natural desire to ward off suspicion of guilt from one's self, even at the cost of fastening it upon another. It appeals to the love of personal security, one of the strongest passions of the human heart. For these reasons, as bearing upon the credit due to the testimony of Absalom Smoke, we think the offered testimony of Susan Smoke should have been received. The cross-examination of Absalom Smoke was not relative to matter merely collateral, and hence his answers were such as the defendant might contradict. What the value of the proposed contradiction was the jury alone could determine. It may be that if the rejected evidence had been

admitted, it would not have changed the conclusion to which the jury came, but they had a right to it for what it was worth.

The other objections which were urged in the court below to the admission of the evidence, are substantially answered by what we have already said. They were not relied upon by the court. It is true, it matters not whether the precise reason given for rejecting the evidence was well founded or not. If for any reason assigned by the Commonwealth it was inadmissible, the decision of the court cannot be regarded as erroneous. But we have endeavoured to show that no such reason was assigned. The motives of Absalom Smoke and his feelings towards the deceased, were, under the circumstances of this case, evidence bearing upon his credibility as a witness, and if so, proper to go to the jury to be considered by them in connection with the other facts of the case. The third objection mistakes the purpose for which the evidence was offered. It was not to exculpate the accused by throwing the guilt upon Absalom Smoke, but to impugn the testimony of Smoke himself.

It may be remarked that we have not noticed an objection to the admission of Susan Smoke's testimony, not made in the court below, and not insisted upon here. Absalom Smoke had not been cross-examined respecting any declarations made by him to Susan Smoke—his attention had not been called particularly to them. This ordinary prerequisite to contradicting him, in the manner proposed, was wanting. But this was not one of the objections urged against the admission of her testimony. It must therefore be considered as having been waived. A party who assigns reasons for either the admission or rejection of evidence, may properly be considered as having abandoned all other than those he specified. Had this objection been made, it might have been removed at once by recalling Absalom Smoke for further cross-examination, with the consent of the court.

The second assignment of error is without foundation. Even if the question was improperly allowed to be put, it elicited no answer that was hurtful to the defendant. And we cannot say that there was any error in permitting the inquiry. Susan Potter, one of the defendant's witnesses, had testified on cross-examination, that she did not ask John Rohn what they could prove against Billy (William Gaines the defendant). She had been interrogated respecting the matter to test the feeling towards the accused, with which she had testified. The evidence sought to be obtained from John Rohn was therefore directly at variance with her testimony. Nor was it in regard to immaterial or irrelevant matter. The motives under which a witness testifies, his partiality for the party who calls him, or his prejudices against the opposite party, are not collateral, as has often been decided. If, in truth, Susan Potter, in a conversation respecting the coming trial of the defendant,

[Gaines v. The Commonwealth.]

inquired what could be proved against him, the fact indicated, though it may have been slightly, her interest in his situation, and her state of feeling towards him. If not, however, it is enough for this assignment that the answer elicited was too unimportant to have any effect upon the case.

The third assignment of error cannot be sustained. It is not contended that the evidence received was not pertinent to the issue, but it is said it was evidence in chief, rather than in rebuttal. It might suffice to say in answer to this, that it lies in the discretion of the court to admit or overrule evidence offered in rebuttal, which might have been given in chief and for the furtherance of justice. It is often necessary to exercise this discretion. Perhaps the testimony to which objection was made in this case might have been given when John Condon was first called to testify for the Commonwealth; that is given in chief, but it is not difficult to see that it was more appropriate to rebuttal of the evidence which the defendant had adduced. It is manifest from an examination of the course of the trial, that much of the testimony of the defence was directed to establish the position that Absalom Smoke had fired the gun with which the murder was committed, and that he, rather than the defendant, was the murderer. This was a theory set up by the defence after the testimony of the Commonwealth in chief had closed. Witnesses were even called to prove that Smoke had acknowledged that he was the guilty agent, and it was in evidence that he had borrowed a gun on the evening of the murder and afterwards returned it. When, therefore, Condon was permitted to testify that the gun which Smoke had borrowed, had not been discharged, after it was borrowed and before it was returned, his testimony went in direct reply to this theory, and in rebuttal of the evidence on which the theory was founded.

The only remaining error assigned is to a part of the charge of the court. Several of the witnesses had testified to having seen blood on the day after the murder in various places, near the window through which the fatal shot was fired, and along the route which the murderer was supposed to have taken. As the defendant had been wounded shortly before the murder, and was bleeding profusely, the evidence, if believed, tended to show that he was near the place when the gun must have been fired; that he had returned to the house of the deceased, without any other apparent motive for his return than a desire for revenge upon the deceased, who had wounded him, and had retreated again along the route over which the blood was traced, to the place where he was afterwards discovered. Indeed it was most pregnant evidence, difficult to be reconciled with any other hypothesis than that of his guilt. Whether what the witnesses saw was really blood, was therefore a vital question. They testified positively that it was. They saw it the next day, and they traced it a considerable distance. In

[Gaines *v.* The Commonwealth.]

regard to this the charge of the court was most cautious. The jury was told that it must be shown the substance which the witnesses supposed to be blood, was indeed blood, was human blood, and the blood of the defendant. Then was added the part to which exception was taken, as follows : " If the witnesses who had testified on the subject, could not, by the examination which they made, ascertain with certainty whether what they supposed to be blood was really blood, then the proof falls short of the requirements of the law ; but we cannot instruct you that because no analysis had been made of the substance which the witnesses supposed to be blood, no chemical test, no microscopic examination, that you are therefore to reject the evidence as insufficient to show that it was blood. We feel it to be our duty to refer the question to you, and leave it for you to say whether the Commonwealth has satisfied you beyond a reasonable doubt that the spots seen by the witnesses were blood."

It seems strange to us that any exception has been taken to this instruction. Yet it is insisted on behalf of the defendant, that the Commonwealth was bound to prove, by chemical analysis or microscopic test, that the substance which the witnesses saw and declared to be blood, was such, and that all evidence short of such analysis was insufficient, and should have been withdrawn from the jury. The position is wholly untenable. It is said to rest on the rule that the law requires the best evidence. No doubt it does the best in kind, but not the best possible in degree. The conclusions of analysis are superior only in degree, not in kind to those of ordinary observation. As between witnesses, one is not to be excluded because another had a better opportunity of knowing a fact deposed to. In addition to this, analysis was impossible when the case was tried. The stains whether of blood or other substance had not been preserved. There was then no higher evidence, even in degree, in existence. None superior could have been produced, and the rule requiring the best evidence never excludes that which is the best that can be produced *when* the evidence is offered : 1 Stark. Ev. 644. No other exception was taken to the charge, and none could have been with reason, with the exception of the single error which we have noticed. The case was well tried, with strict adherence to the rules of law, and with a careful and humane regard to the rights of defendant. But for the refusal to receive the proffered testimony of Susan Smoke a new trial must be ordered.

Judgment reversed, and a *venire de novo* awarded.

THOMPSON, J., dissented as to the first assignment of error.