## Commonwealth v. Blassingale

584

*Neil L. Strauss,* Assistant District Attorney, for Commonwealth.

*Gerald F. Tietz,* for defendant.

R. B. KLEIN, J., December 4, 1972.—Defendant, Melvin Blassingale, waived a jury trial and was tried on May 25, 30, and 31, 1972. He was adjudged guilty of conspiracy on January sessions, 1972, bill no. 96. He was found not guilty on a companion bill, no. 97, charging him with murder.

Motions for a new trial and in arrest of judgment were filed. On September 15, 1972, both motions were dismissed. Defendant was sentenced to serve a term of not less than 11½ months nor more than 23 months at the Philadelphia County Prison for the conspiracy charge.

In his motions for a new trial and in arrest of judgment, defendant raises two issues of law.

The first issue relates to the trial judge's refusal to sustain an objection made by defense counsel to an answer given by a Commonwealth witness to the defense counsel's own question. Defense counsel asked the witness what defendant was doing at the time of the shooting, and the witness replied that defendant and another male "were just standing on the corner like they was lookouts to see when the cops were coming."

The second issue raised by defendant is the sufficiency of the evidence to sustain a conviction of con-

spiracy. Defendant contends that the theme of guilt does not reasonably flow from the facts and circumstances proven.

The facts proven are that defendant and two other members of his gang together went into rival gang "turf" at 8:30 at night; that defendant and one member of the gang crossed the street and started looking around; that the third member of the gang continued down the street to a corner where rival gang members were standing; that the third gang member pulled a gun and said "F— it, this is the Valley" (the Valley being the name of their gang); that the third gang member then fired several shots, one of which killed Theodore Roberts; and that then the third gang member yelled "Come on" and all three members of the Valley gang ran off together. The court held that these facts were enough to establish beyond a reasonable doubt that defendant agreed to participate in illegal gang activity.

### I. The Testimony Regarding "Lookout."

The testimony relating to a "lookout" came as a response to a question by *defense* counsel on cross-examination of Barbara Dennison, a 15-year-old girl who observed the shooting. It appears at pages 62-3 of the notes of testimony of May 25, 1972, as follows:

"Q. [by Mr. Tietz, Defense Counsel] My question is, when Jimmy and Fido [associates of the deceased] began to run, at that moment, at the time that Jimmy and Fido began to run, what did the defendant do?

"A. [by Barbara Dennison] They didn't do nothing, they were just standing on the corner like they was lookouts to see when the cops were coming.

"MR. TIETZ: I object to that.

"BY MR. TIETZ: What do you mean, he was a lookout?

"MR. STRAUSS [Assistant District Attorney]: I don't think defendant's counsel can object to his own question.

"THE COURT: I think the answer was responsive to your question. Objection is overruled.

"BY MR. TIETZ:

"Q. What do you mean he was acting like a lookout?

"A. Like they were looking to see when the cops came so they would tell him.

"Q. What do you mean, they were looking around?

"A. They were standing up there looking so they must have been lookouts for him.

"Q. They were just looking, you mean?

"A. Yes.

"Q. You were looking too, weren't you?

"A. Yes, I was looking.

"Q. What were you looking at?

"A. I was looking at what was happening.

"Q. Were they looking at what was happening, too?

"A. Yes, they were lookouts for the cops too. . . ."

There is no merit in defense counsel's contention that the answer was not responsive to his question. He asked the witness what defendant was doing. As best she could, that is what the witness told him. She told him that defendant and his associate were not doing anything, that they were standing on the corner, and she described the manner in which they were standing on the corner.

Defendant's argument that this testimony constitutes inadmissible opinion evidence is also without merit. In the original answer, to which defense counsel lodged his only objection, the witness did not say that defendant *was* a lookout, but that he was standing on the corner "like" he was a lookout.

By this answer, the witness was merely using a shorthand method to describe the manner in which defendant and his associate were standing on the corner. While, obviously, it is impossible to determine whether or not a person, in fact, *was* a lookout merely from observation without knowing his state of mind, it does not require an expert to determine whether or not his *actions* were similar to those that would be observed if he were, in fact, a lookout. A lookout, according to Webster, is a watchman or guard. Someone acting like a lookout would be looking all around to see if anyone were coming. It is clear that this is what the witness was saying when, in response to a question asking whether defendant and his associate were looking at what was happening with respect to the shooter and the deceased, Barbara Dennison said, "Yes, they were lookouts for the cops too." In other words, defendant and his associate were not just looking at the action across the street, but were also looking around to see if the police, or others, were coming.

One can only expect so much clarity of expression from a young witness such as Barbara Dennison. She is 15 years of age, and was a ninth grade student before she was committed to Sleighton Farms, a correctional institution for girls. She lived in gang-infested areas of the city, and the record indicates that she frequently observed gang wars. Actually, she very well might have the expertise to qualify as an expert to determine who was or was not a "lookout" in the event it were required that she have such expertise.

This witness described her observations as best she could to respond to defense counsel's questions.

The problems of describing events without inject-

ing "opinions" is well described in Brown, Pennsylvania Evidence, 111-112:

"(1) Where it is impossible to describe one's observations with such clarity and definiteness that the jury can draw the inferences as well as the observer, assuming that it is otherwise relevant, opinion evidence is admissible. For example, even a lay witness may describe a stain as being blood. (Gaines v. Com., 50 Pa. 319.) This is actually a short hand summation of many correlated facts which are impossible to describe with such precision and particularity that a jury would be able to visualize the thing or condition as it impressed the witness, and though the statement is opinion evidence, it is admitted because of necessity.

"(2) In a psychological sense, all testimony by a witness as to what he observed with his senses is opinion evidence, since one testifies to the reaction of his senses to a stimulus . . .

"(3) In the legal sense, the line of demarcation between matters of fact and of opinion is frequently so indistinct that the admissibility of the testimony is largely a matter of the trial court's discretion, and even if technical error has been made, there will be no reversal in the absence of prejudicial error."

The instant circumstance is a case where even if there was technical error, it was harmless. The case was tried to a judge sitting without a jury. The trier of fact was certainly able to appreciate that the witness' testimony was only relevant to describe the actions of defendant, and not his state of mind. The trier of fact could also see the limited value of the testimony, which was that defendant was not just looking at the scene involving the shooter and his victim, but also was looking around at the other sides of the intersection. Moreover, there is ample evidence

to support the finding of guilt of conspiracy without the "lookout" testimony.

## II. The Sufficiency of the Evidence.

To argue that the evidence in the instant case is insufficient to sustain a conviction for conspiracy is to argue that the trier of fact must ignore the facts of teen-age gang violence that plague Philadelphia.

In the context of urban Philadelphia in 1972, the facts of this case compel the conclusion that defendant conspired with other members of the "Valley" gang to engage in illegal gang activity.

The basic testimony of the two Commonwealth witnesses was generally well summarized by defense counsel in his memorandum of law in support of defendant's motion for new trial and in arrest of judgment, as follows:

"It is uncontroverted that on November 9, 1971, a young, black male, nicknamed 'Wild Bill' was seen walking in an easterly direction on Norris Street between 31st and 30th Streets at about 8:30 P.M. 'Wild Bill' reached the northwest corner of 30th and Norris Streets whereupon he encountered three young men, two of whom were members of the 30th and Norris gang and the third, named Teddy, was apparently a member of no gang. As 'Wild Bill' reached the corner, he yelled 'F— it, this is the Valley.' Then 'Wild Bill' pulled a gun from his pocket, pulled the trigger but the gun misfired once, and then proceeded to shoot either four or five times, hitting Teddy. At the sound of the click of the misfire, the two persons who had been standing with Teddy ran North on 30th Street. Immediately after firing the last shot, 'Wild Bill' ran East on Norris Street. It can also be reasonably inferred from the testimony that the defendant and 'Wild Bill' were both members of the Valley gang.

"With respect to the identity of the parties, the witness, James Waiters, saw 'Wild Bill' and two other boys on the North side of Norris Street together walking towards the intersection of 30th and Norris Streets. He testified that at some point in the block between 31st and 30th the other two boys crossed Norris Street to the South side of the Street and proceeded to the Southwest corner of the intersection of 30th and Norris Streets while 'Wild Bill' was proceeding to the Northwest corner of 30th and Norris Streets. Waiters further testified that he did not see the faces of either of those other two boys so he could not identify them. Barbara Dennison testified that the first time she saw the defendant he was on the South side of Norris Street with 'Stitch' walking toward the Southwest corner of 30th and Norris Streets, at the same time that 'Wild Bill' was on the North side of Norris Street walking towards the Northwest corner of 30th and Norris Streets.

"With respect to any conversations or talking that took place on this evening at this intersection, James Waiters testified that the only thing that he heard after 'Wild Bill' said 'F—it, this is the Valley' were the four or five shots. Barbara Dennison, on the other hand, testified that after 'Wild Bill' fired the last shot, he yelled 'Come on.'

"With respect to the time sequence of when various persons ran from the scene, James Waiters testified that the other two boys whom he couldn't identify on the Southwest corner of 30th and Norris ran at the same time that he ran, i.e., immediately after the click of the misfire. Barbara Dennison, on the other hand, testified that the defendant and 'Stitch' didn't run until after the last shot was fired and 'Wild Bill' had yelled 'Come on,' which is also when 'Wild Bill' ran.

"Finally, James Waiters testified that he observed

the two people whom he couldn't identify stop at the corner, that the lighting was pretty good at that corner and that those two boys whom he couldn't identify didn't do anything except stand at the corner briefly and then run. Barbara Dennison also testified that the defendant was doing nothing except to stand at the corner before he ran, and that prior to reaching the corner while they were walking they were walking just like any normal person walking down the street. Then, however, when asked essentially the same question she had been asked a few minutes earlier, and to which she had replied that the defendant was doing nothing except standing, witness gave the . . . answer that defendant and Stitch were 'just standing on the corner like they was lookouts to see when the cops were coming.' "

From the testimony, the trier of fact reasonably adduced that the following were the facts of the incident on the night of November 9, 1971:

1. Defendant, Melvin Blassingale, a member or former member of the Valley gang, was in the company of "Wild Bill" and another member, or former member, of the Valley gang.

2. The three members of the Valley gang walked together down Norris Street toward Thirtieth and Norris, the heart of the "turf" of the Thirtieth and Norris gang, a rival gang.

3. Approaching the corner, "Wild Bill" continued straight while defendant and the other Valley member crossed Norris Street.

4. Defendant and the other Valley member arrived at the Southwest corner of Thirtieth and Norris and started looking around.

5. "Wild Bill" arrived at the Northwest corner of Thirtieth and Norris where he encountered two mem-

bers of the Thirtieth and Norris gang and the deceased, who was not a gang member.

6. "Wild Bill" yelled "F—it, this is the Valley," then pulled a gun from his pocket, and after a misfire, fired four or five shots, one of which killed Theodore "Teddy" Roberts.

7. After the shooting, "Wild Bill" yelled "Come on" to defendant and the other Valley gang member, and the three fled in the same direction.

These facts not only support a conspiracy conviction, but also could support a murder conviction. However, the trier of fact found reasonable doubt that defendant anticipated a cold-blooded murder by "Wild Bill," so the issue becomes whether the facts support a conclusion that defendant conspired to participate in unlawful gang activity short of murder, namely, assault and battery or riot.

To be guilty of conspiracy, there must be proof beyond a reasonable doubt that defendant did "falsely and maliciously conspire and agree to . . . do . . . [a] dishonest, malicious, or unlawful act to the prejudice of another": The Penal Code of June 24, 1939, P. L. 872, sec. 302, 18 PS §4302.

To argue that it is as likely as not that defendant's trip into the heart of rival gang turf was to pass the time of day or for some other lawful purpose is to indulge in incredible naivete.

The first fact that one must examine is that violent activity *did* take place. "Wild Bill" did without provocation, at least without immediate provocation, pull a gun and commit a cold-blooded murder.

Another key fact is that before the killing, "Wild Bill" gave the battle cry of the Valley gang, "F—it, this is the Valley." This labels the action not as a personal vendetta but as gang-related activity.

Defendant and third Valley member came to the

scene together and, following "Wild Bill's" exhortation of "Come on," left together.

The circumstances of the shooting make it clear beyond a reasonable doubt that "Wild Bill" was planning unlawful gang activity. The circumstances of the shooting, coupled with the battle cry and the joint arrival and departure of the other two Valley members make it clear beyond a reasonable doubt that defendant knew some kind of unlawful gang activity was to take place and conspired and agreed to assist in it. Under these circumstances, it is exceedingly unlikely that this venture into rival gang territory was for an innocent purpose.

The closest case on point is Commonwealth v. Pierce, 437 Pa. 266 (1970). It is noted that the case is not only close in legal theory, but also close in geographic proximity. The Pierce case involved the Thirty-second and Berks gang. Thirty-second and Berks is three blocks from Thirtieth and Norris, the scene of the murder of Theodore Roberts.

The Pierce case sustained a conviction for voluntary manslaughter on the theory that defendant aided and abetted the shooter. Defendant in Pierce shouted "Thirty-second and Berks," which he said was an invitation to a "fair one," i.e., a fight. Four seconds later, an associate of his pulled a gun and shot dead a member of the rival gang. Speaking for the court, Justice Roberts said: "In the instant case the trier of fact could very well conclude beyond a reasonable doubt that appellant's shout of 'Thirty-second and Berks,' in light of the surrounding circumstances, was rendered to induce Smith to commit the crime. Appellant may not, therefore, on the state of these facts, maintain that he was merely a spectator and not a participant in this crime."

Of course, there are differences between Pierce and the instant case. Defendant was the shouter in Pierce

while the shooter was the shouter in this case. However, Pierce stands for the proposition that the shout of a battle cry indicates a joint venture rather than the mere act of one individual.

Commonwealth v. Garrett, 423 Pa. 8 (1966), is another case relating to the degree of evidence necessary to sustain a finding of joint participation in a crime. In Garrett, a person who was robbed said defendant was one of four men behind him as he crossed a bridge. Some of the group then hit him, rendering him unconscious, and robbed him. The victim did not know who hit him. Defendant was still on the scene shortly after the incident. In a statement, defendant acknowledged being part of the group, but said he left the scene prior to the attack, after rejecting the suggestion of one of his companions that he join in robbing the victim. In this case, the court found that the inference that appellant participated in the crime was no more cogent than the version of the facts contained in his statement.

Garrett is very different from this case. There are many facts missing in Garrett that are present in the instant case. Defendant Blassingale was continuously observed during the commission of a crime in a position where he clearly could have been participating. A gang battle cry was given, indicating joint action. Defendant was in rival gang turf at 8:30 p.m. This places Blassingale at the scene and leads to the reasonable inference that he knew that gang activity was to take place and agreed to join in it.

Other cases that find an insufficiency of evidence also involve considerably fewer facts than the instant circumstance. For example, Commonwealth v. Simpson, 436 Pa. 459 (1970), and Commonwealth v. New, 354 Pa. 188 (1946), both involve cases where defendant was placed with the deceased shortly before his death, but this proximity in essence was the only evidence

presented by the Commonwealth. In Commonwealth v. Young, 446 Pa. 122 (1971), the elements of the crime, attempt with intent to kill, were never made out and, also, defendant was not placed on the scene at the time of the alleged attempted shooting.

The Commonwealth has not directly proven an express agreement in the instant case. However, as the appellate courts have stated, " 'The Commonwealth was not required to prove an express agreement. It is very rare that a formal or explicit agreement can be proved in a conspiracy case' ": Commonwealth v. Gaines, 167 Pa. Superior Ct. 485, 487, 75 A.2d 619 (1950); Commonwealth v. Weiner, 148 Pa. Superior Ct. 577, 581, 25 A.2d 844 (1942). Also, "The fact of the combination is almost always inferred by the jury from the acts, the overt acts of the parties, as direct evidence in the shape of declarations can seldom be shown' ": Commonwealth v. Gaines, supra, at 488; Commonwealth v. McHale, 97 Pa. 397, 405 (1881).

Defendant was placed at the scene by Barbara Dennison, who was firm and positive in her identification of Melvin Blassingale and who knew who he was because he was pointed out to her previously. Despite extensive vigorous cross-examination, Barbara Dennison was consistent with respect to all major elements of the incident, and any minor inconsistencies in her testimony could be expected considering her young age and the passage of time from the event. The facts adduced from her testimony and that of James Waiters reasonably lead to the inference that Melvin Blassingale conspired to take part in unlawful gang activity.

There was sufficient evidence upon which the trier of fact could properly adjudge defendant guilty of the offense for which he was convicted.

A careful reading of the record reveals no material error in the conduct of the trial.

Accordingly, the motions for a new trial and in arrest of judgment were denied properly.