Birchard, O. J.
This is a bill filed to enforce the execution of *491 an alleged trust, and the existence of that trust being put in issue by the answer, our first duty is necessarily an investigation of the disputed matter of fact. We direct our attention, then, to the inquiry whether, by the unalterable articles of the constitution, the German United Lutheran and Reformed Congregation of St. Paul’s Church of Columbus is forever connected with the Evangelical Lutheran Synod of Ohio, etc. The answers of the respondents, embracing a large majority of the congregation, and including their pastor, deny this connection. By the proof of the witnesses whose depositions have been taken, it is very manifest that a largo majority of the present members of the church suppose and believe that no indissoluble connection with the synod was ever formed. On the other hand, some members.claim that from the first formation of the church, in 1817, down to the year 1846, it had a connection with the synod, which was of vital importance, and that a severance of that connection destroyed the original character of the congregation, which *could only hold its property [585 and exercise its functions in that connection. To settle this litigated matter the parties necessarily refer to their common constitution, which is the article of agreement under and by virtue of which the indissoluble connection is, if at all, to be established. Article 2, chapter 1, of the constitution reads thus: “ It is the duty the pastor to set his congregation an example by leading a true Christian life. But should he wander or quite fall into open vice (which God in his mercy forbid), then it shall be the duty of the church council several times to admonish him to amend his conduct ; but should he disregard such admonition, and continue to offend the church, then the council shall report the same to the synod to which the congregation has attached itself, and to which the pastor shall also belong.”
This is the only mention made of any synod throughout the constitution, except article 1, chapter 6, which prohibits strange preachers from preaching in the church without the production of satisfactory credentials from an Evangelical Lutheran Ministerium, a Reformed Synod, or a preacher of good standing in said church.
By article 6, of chapter 6, provision is made for altering any article of tho constitution by a vote of two-thirds of the voting members, except articles. 1, 2, 4, 5, and 6, of chapter 6, which are declared unalterable forever.
The difficulty in the congregation has arisen upon the construc *492 tion of article 4. The original being in the German, it has been translated thus: “The same connections which have existed in this congregation from its first organization up to this time shall in every respect continue in all future time. In order, however, to prevent all misunderstanding and difficulties which, in the course of time, might arise between the Lutheran and Reformed members, it is hereby fixed and decided that no separation or division of the church property shall ever take place, nor shall ever a common property (or community of interest) be had or exercised therein by two or more independent congregations.” The word translated in, in the first line of this ^article 4, is by some translated with, and whether the connections in or within the congregation, were intended to be fixed and made permanent, or such connection as then existed with other bodies was intended, seems to be the great question upon which the case turns, and the whole cause of this suit. Different translators have placed different meaning upon the German word bei, which the respondents have translated in and the complainants with. But this fact stands forth prominently in this case, and meets us at the threshold. The congregation is exclusively German ; its members speak that language. It is their mother tongue. They employed it in framing their articles of association, as the medium of their thoughts and the evidence of their meaning and intention, and it would be strange, indeed, if three-fourths or five-sixths of the entire congregation should use words that bound them irrevocably and forever to a synod, without the least intention of so doing. They swear, that if the connection was unalterably fixed with the synod, the thing is contrary to their intention, and what they never would have consented to knowingly. Again, the only articles in which the synod is referred to, are articles which are subject to be altered at any time by a two-third vote of all the voting members. They may change those articles in accordance with the provisions of the constitution, and without any violation of their social compact.
Upon the meaning of the words of article 4, the congregation has expressed its own views, in the form most solemn which is known to them as a religious body, that is, by a vote of more than two-thirds of its members. In the amendments to their constitution, regularly adopted and passed in a regular meeting of the congregation, after reciting article 4 of chapter 6, the church has *493 declared its moaning in these words : “Here, it is clearly given to understand, that our church is and shall and must remain an inseparably United Lutheran and Reformed one, as our documents from its original formation show.” The confessional connections between the Lutheran and Reform members of this congregation *are the only ones here referred to in this unalterable article; other indissoluble connections the congregation has now up to this time. This is one of the alterations which in the bill are called pretended amendments. We refer to it hero, not •or the purpose of sanctioning it as a valid declaration of the true meaning of article 4, but to show the views of a largo majority of the congregation at a time when wo may suppose the controversy had not progressed so far as to produce as much excitement and consequent prejudice or bias as may possibly have existed at a later period. In a matter so groat as this is, whether we are called upon to reverse the decision of the respectable pastor of a religious church, beloved by the great majority of his congregation, who esteem him as a valuable toacher, who act with him, sustaim him in his views by their votes in meetings of their church, and by their oaths in the interpretation of the articles of their association, and in bearing witness to his faithfulness, it is certain that we ought to bo well satisfied that justice and the very right is with those who demand judicial interference. The property of the church ought not to bo wrested from the lawful control of its members on any ground. It should not be interfered with by a chancery proceeding, and taken from the control of a majority of the church on slight ground, or for a cause which is not clear or free from doubt. More especially should equity refuse its aid to enforce the literal terms of an article, to exact to the uttermost the performance of an engagement against parties who would not have entered into it, if they had understood it to mean what is now claimed to be its meaning.
In general, the office of a court of chancery is not such as to compel it to exact forfeitures, and enforce them. This church has dissolved its connection with the Evangelical Lutheran Synod of Ohio, and therefore, say complainants, it has violated its constitution, and broken the condition in the deed from Heckman. This is the burden of the complainant’s complaint.
Now upon what foundation docs this gravo charge rest? *Upon the meaning of the word bei. A word of doubtful *494 meaning, from the testimony of all witnesses. A G-erman preposition, that may be rendered in, within, or with, according to the context; and consequently, a word the German members of the congregation would have understood in reference to the subject upper» most in thoir minds at the time it was used. In construing statutes, one rule given by able writers as a guide to the moaning, is to consider the evil that was to be apprehended, and the remedy that was intended to be provided against that evil. That same rule is applicable here. And for a moment let us apply it. The congregation was a mixed one, embracing members agreeing in many of the more essential articles of faith and worship, and disagreeing on others which were considered by the early reformers of vital importance. A difference which had separated that strong-minded and sincere Christian, Martin Luther, from the fellowship of Christian brethren, who, like him, had been great in thoir day, in the great work of the reformation. From the beginning, this congregation had formed connections with themselves, incompatible with the established creed of the two distinct churches of which the members were composed. It was natural to anticipate that time might produce dissension, upon points which up to that period had been accommodated; and if so, difficulties would arise in reference to the church property, and the Lutherans and Reformed might separate. The object in view was to provide' for these contingencies, as is shown by the proof, and as may be gathered from this fourth article of the constitution. Hence, the latter clause of the article : “ In order to prevent difficulty which might arise between the Lutheran and Reformed members,” a provision is made against the division of the church property, against a community of interest by two or more separate congregations, and the connections between them are declared indissoluble. The connections which, it seems to us, were the object of article 4, were those vital to the unity, existence, and harmony of the church 5S9] as a distinct body. The separations and divisions *to be guarded against as utterly destructive, were then anticipated among the two sects who had been and were united in a common church. The plain object seems to have been to prevent a dissolution by the withdrawal of either the Lutheran or Reformed members, and a division of the property.
Their remedy agreed upon and fixed, was to make their existing state of union with each other unalterable, and to bind *495 themselves by the ties of compact and community of interest in the church property, as a distinct, inseparable congregation. The proof clearly shows this to have been the paramount object of a lai’ge portion of the congregation at the time. Not a word was said about a permanent union with the synod. Nono had ever existed with that body, except by their voluntary consent; and to secure that connection in all future time was entirely foreign to the matter, which was then immediately and particularly engrossing the attention of the church.
In view of all these facts and circumstances, we are not prepared to adopt the views passed upon us on behalf of the complainants, and unite in the conclusion that the px-oof does not warrant a finding that the trust alleged as the foundation of our jurisdiction, had any legal existence binding upon the church in the manner set forth in the bill. This conclusion renders all further inquiry into the causes of difficulty unnecessary. They are matters beyond our jurisdiction, and to be settled by the society in the judicatories peculiar to its own oi’ganization.
Bill dismissed.