Commonwealth *v.* New, Appellant.

190

Argued April 15, 1946. Before MAXEY, C. J., DREW,
LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Theodore Smithers,* with him *Frank I. Ginsburg,* for
appellant.

*R. Paul Lessy,* Assistant District Attorney, with him
*C. William Kraft, Jr.,* District Attorney, and *Raymond R. Start,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 28, 1946:

For a long period prior to June 24th, 1945, Lee Joe,* a Chinaman aged 70 years at that date, conducted a laundry at a small one-story dwelling at 2616 West 3rd Street, Chester. At 9:15 A.M. Sunday, June 24th, he, clad only in an undershirt, was found lying in a pool of blood on his bedroom floor. He had three lacerations at the right side of his head and one in the middle of the back of his head. The cause of his death was multiple fractures of the skull. On the floor were cigarette butts, an over-turned ash-tray and a hammer handle. The bloody hammer which fitted the handle was found on a shelf. No finger marks were found on the hammer or the hammer handle. No finger marks of the defendant were found on any object in the victim's house. The pockets of the victim's clothes were turned inside out. On the bed was an empty purse and a brown hat with a small red feather in it. In the kitchen a money box was found pried open. A half empty bottle of beer was found. At 2:00 P.M. on June 23rd, a colored girl, Ethel M. Williams, who worked for Lee Joe, saw him as he gave her her wages, with a roll of money "one inch thick" and which contained "some fives and twenties, fifties and a one-hundred". The only money found on his premises was in a barrel and it amounted to $123.00.

Woong Knee New, (usually referred to as Knee New), also a Chinaman, now aged 41 years, had visited Lee Joe once or twice a week for fourteen months. They were friendly and called each other, respectively, "Son" and "Pop". Knee New had been in the United States

---

* He is thus named in the indictment, but throughout the trial he was usually referred to as "Joe Lee".

about two years and had worked in the Sun Shipbuilding Yards for about eighteen months. His last day at work was Monday, June 18th, 1945. He then quit work because the immigration authorities were seizing Chinese at the plant for deportation to China. Two years earlier, Knee New had come from Singapore; within a day after the murder he was arrested in New York by immigration agents as an "illegal entry" and was lodged at Ellis Island for deportation. Earl H. Allen, a Delaware County Detective, who interviewed Knee New at Ellis Island on Tuesday, June 26th, testified that the defendant told him that he left Chester Sunday morning, June 24th. The detective again saw Knee New at Ellis Island, in company with Detective Horris and Croak of the New York City Force, and Francis Holt, of the Chester Police. He said the questioning was done by Detective Horris because the defendant "seemed to understand him better than anyone else". The conversation was in English and no stenographic notes were taken. The defendant, in reply to questions, told the officers (so it is alleged) that he had left Chester at 10:30 A.M. June 24th and reached New York at 12:30 P.M. and went to his cousin's home at 316 Mott Street, that he had worked at the Sun Shipbuilding Yard for 18 months and that he had 4 days' pay coming to him. Detective Holt asked Knee New if he had any money. He answered "No". He was searched and a few dollars were found. Then Detective Holt raised his shirt and a money belt which contained $1212 was found. None of this was ever identified as Lee Joe's money. The officers asked him if he would go back to Pennsylvania and he said he would. The next day the officers took him to the New York City Police Department. He was then questioned for the first time about the murder of Joe Lee. He was asked: "When did you see Lee Joe last?" He replied: "Last Saturday night, Sunday morning." In reply to further questionings, he said: "I was with Lee Joe until 4:00 A.M." and that he had "a glass of beer". He was then asked: "What was Lee Joe doing?"

and he replied: "He was ironing clothes and I wet clothes to help him." Holt then asked: "What was Lee Joe doing when you left him on Sunday morning?" The defendant then put his hands on his stomach and said: "I sick; I sick; no more questions." The detective said: "That was the last of the conversation."

On June 19th, 1945, the defendant had withdrawn from a Chester Bank $308.16, including three $100 bills. On the following day, he went to New York and withdrew from a Bank eight $100 bills and a $50 bill. This was proved by his own testimony and by the bank records and by bank officers. These withdrawals were allegedly due to the fact that he was afraid he was about to be deported to China. He said: "Immigration office pick up somebody else and then I was so afraid that I didn't dare to go to work." He had $47.29 coming to him from the Sun Shipbuilding Company. When asked why he didn't draw that money out, he answered: "I didn't dare to take money out", indicating thereby that he didn't dare go where the immigration authorities were. On Thursday, June 20th, according to his testimony, he went back to Chester and sent from there by parcel post to New York some bags of personal belongings and then he visited a sick friend, Tee Soy, in the Chester hospital. This friend paid him $10, which he owed him. The defendant testified that he left Chester for New York at 1:05 A. M. Friday, June 22, 1945, and did not return until after his arrest.

The Commonwealth claimed that he was in Chester on June 23rd and 24th. He refused to return to Chester voluntarily and he was extradited after proceedings in New York City on July 28, 1945, when he also denied being in Chester on June 23rd and 24th. He was indicted and after trial he was convicted of murder in the first degree and the jury fixed the penalty at life imprisonment. The motion for a new trial was overruled; this appeal followed.

To obtain a conviction the Commonwealth relied upon circumstantial evidence. Such evidence is legal

evidence and it may be of great probative value. All circumstantial evidence is based in part upon "positive" or direct evidence, or what Wigmore calls "testimonial evidence". The circumstances from which the major fact in issue is to be inferred have to be proved chiefly by testimonial or positive evidence. If the so-called "positive" evidence is erroneous or merely conjectural, no reliable inference can be drawn from it. So-called "positive" evidence is often based in fact upon inferences, i.e., circumstantial evidence, as Chief Justice GIBSON pointed out in *Com. v. Harman,* 4 Pa. 269, 272.

"Each class [of evidence] has its special dangers and its special advantages". Wigmore on Evidence, 3rd Ed., Sec. 26, p. 402. In *Com. v. Webster,* 5 Cush. 295, 311, Chief Justice SHAW said: "The disadvantage [of positive evidence] is, that the witness may be false and corrupt, and that the case may not afford the means of detecting his falsehood. . . . The disadvantages [of circumstantial evidence] are, that a jury has not only to weigh the evidence of facts, but to draw just conclusions from them; in doing which, they may be led by prejudice or partiality, or by want of due deliberation and sobriety of judgment, to make hasty and false deductions; . . ." In *Com. v. Libonati,* 346 Pa. 504 (a murder case), this court said, p. 508: "The requirement of the law is that in order to warrant a conviction the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt—not that they need be absolutely incompatible with his innocence—and that doubt is for the jury unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances'." (Citing cases). See also *Com. v. Bausewine,* 354 Pa. 35, 41. In *Com. v. Bone,* 64 Pa. Superior Ct. 44, the Superior Court said that evidence sufficient to implicate an accused in a crime "must be something more than evidence showing remote connection between the accused and the crime, or evidence that merely raises a suspicion of guilty inten-

tion: 5 Corpus Juris 579". An accused is entitled to an acquittal if his guilt of the crime charged is *not* the only reasonable interpretation of which the facts adduced against him are susceptible. Guilt must be *proved* and not merely *conjectured*.

Measured by the foregoing established standard of proof, the Commonwealth's proof is utterly inadequate. The two "cornerstones" of its case are these alleged facts: (1) The defendant was with Lee Joe at 4:00 A.M. June 24th. The Commonwealth claims that the defendant when arrested admitted this. How he fixed this time so definitely does not appear and whether or not he understood the questions asked him in English we will later discuss. (2) "The time of death was fixed at between 2:30 and 4:30 A.M. June 24th, 1945", (quoting from the Court's statement). The Coroner's Physician, Dr. Vincent A. Nacrelli, gave it as his "personal opinion" that Lee Joe was killed between the hours stated, and that the victim's death was "presumably instantaneous". His statement as to the time of death was obviously a mere conjecture. He based it on the fact that he found that rigor mortis "started to set in" at 10:30 A.M. and upon the assumption that rigor mortis "begins to set in between six and eight hours after death generally". Upon cross-examination he said that rigor mortis "had not set in at 10:30 but it had set in completely at 1:30." When asked whether or not rigor mortis had ever been known to set in two hours after death, he answered: "Yes". He was asked: "Is it possible for rigor mortis to set in three hours after death?" He answered: "It is possible for it to set in immediately; it may be delayed for days at the same time". He admitted that age "speeds it up" and that "time is quite variable . . . it is possible for it to set in immediately". After the defendant's counsel had cross-examined the physician at some length as to the hour of the victim's death as indicated by the onset of rigor mortis, the court said to the counsel: "You are asking him to fix a condition he knows nothing about . . . Do you think the doctor can guess?" "He is called to

show the cause of death. This is not proper cross-examination." Dr. Nacrelli was the only witness who testified as to the time of the victim's death and he said: "We approximate it". We find in this record no support for the Court's unequivocal statement as to the "fixed" time of Lee Joe's death.

Medical authorities agree that it is not possible to fix the time of death from the onset of rigor mortis. Taylor in his "Principles and Practice of Medical Jurisprudence", Vol. 1, 9th Ed. (1934) on pp. 275 and 276 cites instances where in trials for murder, testimony as to the time of the victim's death based on the condition of the victim's body in reference to rigor mortis after death proved to be unreliable. He says, p. 276: "A period for death may be assigned [based on rigor mortis] which is inconsistent with the proved facts, and thus give impunity to murder". The rule "works both ways" and to fix the hour of death by basing it on calculation as to the onset of rigor mortis "may be inconsistent with the proved facts" and help to convict an innocent man.

Wharton & Stille's "Medical Jurisprudence" 5th Ed. Vol. 3, p. 382, makes this statement: "The time when this rigidity [rigor mortis] appears is generally from two to six hours after death . . . The existence of this muscular rigidity seems to depend largely upon the strength of the muscles of the body. If the muscles are exhausted, either by physiological or abnormal work just before death, the rigidity appears early . . . We find practically, too, that rigor mortis comes on early in death from fever, exhaustion, old age, in deaths from lightning and sunstroke, and in poisoning by strychnin, atropin, pilocarpin and veratrin".

Peterson, Haines and Webster in "Legal Medicine and Toxicology", Vol. 1, 2nd Ed. say: (p. 187) "The difference in time required for the appearance of rigor mortis in the various muscles probably depends upon some difference in their chemical condition." P. 187: "Rigor may, however, be very long delayed or may be so

slight as to escape notice." P. 188: *"A rapid onset of rigor mortis* . . . may be expected, generally, in conditions marked by great muscular exhaustion." P. 188: "The instantaneous onset of rigor mortis has often given decisive evidence of the manner and circumstances of death. It has at times been possible in this way, to determine the existence of fear or other violent emotion at the time of death." P. 188: "The *instantaneous onset of rigor mortis* occurs so frequently after sudden death during violent muscular exertion, and the immediate fixation of the body in the exact attitude and expression at the moment of death has been so life-like, that many remarkable instances of this sort have become matters of common reference." [1]

The Deputy Coroner, Chester A. Renda, who arrived at the scene of the homicide about 9:15 A.M., said: "There were indications of a struggle . . . apparently the man [evidently meaning the victim] tried to get away". If such is the fact, it is probable that Lee Joe met "sudden death during violent muscular exertion" and as a result there may have been a quick "onset of rigor mortis". Since its onset was first observed at 10:30 A.M., it was impossible for any witness to "fix" with any degree of certitude the time of Lee Joe's death at "from 6 to 8 hours before 10:30 A.M." It follows that even if the defendant *was* with Lee Joe at 4:00 A.M. there is no proof that he was with him when he was killed.

---

[1] These same authors say: "It is reported that at the battle of Antietam Creek the bodies of some Union soldiers killed in the exhausting charge near the bridge were found rigidly set in the act of climbing an obstructing fence, or crouched behind the fence in the act of firing, while the intense excitement of the charge was plainly visible in the fixed expression of the face. A startling incident of the charge at Balaklava is recorded by Ogston: 'Captain Nolan, while riding in advance of the cavalry, had his chest torn open by a Russian shell. The arm he was waiving in the air at the moment remained high uplifted, and he retained his seat on his horse, which wheeled around and passed some distance through the ranks before the rider fell.' "

Furthermore, if he *was* with Lee Joe when he was killed, *that fact alone* is not sufficient to convict him of Lee Joe's murder unless there was evidence that *no one else* was with Lee Joe at that time. It has long been established that the mere presence of an individual at the scene of a homicide does not in itself make him a participant in it. Foster's "Crown Law" p. 350 says: "If A happeneth to be present at a murder for instance, and taketh no part in it, nor endeavoreth to prevent it, nor apprehendeth the murderer, nor levyeth hue and cry after him; this strange behavior of his, though highly criminal, will not of itself render him either principal or accessory" of the crime of murder. In *Com. v. Giovanetti,* 341 Pa. 345 at 353, this court quoted with approval the following: " 'The mere presence at a homicide and knowledge of its commission, does not make a person guilty unless he aids, assists and abets'.: Warren on Homicide, Vol. 1, p. 228, sec. 62 (citing cases). If one is 'only a terrified onlooker', neither his presence at the homicide nor his failure to report it would make him an accomplice: Bird v. U.S., 187 U.S. 118, cited with approval in Com. v. Loomis, 267 Pa. 438, 444, 110 A. 257."

If it is accepted as a fact that this appellant was at Lee Joe's habitation at 4:00 A.M. June 24, 1945, and since there is no evidence that *anyone else* was seen with the victim between 4:00 A.M. and the time his body was discovered, suspicion naturally falls upon this appellant, but suspicion is never accepted in a court of justice as a substitute for proof. In *Rosenblum v. Rosenblum et al.,* 320 Pa. 103; 181 A. 583, a civil case in which a charge of conspiracy was made, this court, speaking through Mr. Justice LINN quoted with approval the following from the opinion of Justice STRONG in *Benford v. Sanner,* 40 Pa. 9, 17: "Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case, . . ."

In the annals of crime there are many instances of persons "last seen" with the victim of a murder being suspected of the crime though later another's sole guilt

of that crime was established. Wigmore in his "Principles of Judicial Proof", p. 147 says: *"Opportunity.* When an act is done, and a particular person is alleged to have done it, it is obvious that his physical presence, within a proper range of time and place, forms one step on the way to the belief that he did it. It is true that another person may have done it, but the former is at least within the limited number of persons who could have done it, and thus is fit to become a subject for further investigation". Facts which make a person a further subject for investigation often fall far short of establishing his guilt.[2]

Wigmore, Ibid, p. 148 quotes from Alexander M. Burrill's "A Treatise on Circumstantial Evidence" (1868 pp. 368, 549). Burrill points out the infirmity of proof based upon an inference of guilt of an accused merely from the fact that he was in the vicinity of a crime at the time when it may have been committed. He says, inter alia: (Quoted from p. 151 of Wigmore's "Principles of Judicial Proof") "The principal *infirmative* supposition applicable to the circumstance of opportunity to commit a crime, is that, admitting it proved to have existed, it does not necessarily follow that it was actually taken advantage of by the party shown to have possessed it; or that it was not taken advantage of by another person. In order to give it this effect, where it is solely or chiefly

---

[2] It is easy to make erroneous deductions from circumstances. For example, a human being walking on a country highway is struck by an automobile and fatally injured. The driver of the car runs away. A few minutes later another motorist sees the victim, picks him up, places him in his car and takes him to a hospital. When he arrives at the hospital the man is dead. After he reports the occurrence the motorist is himself "investigated". His car is examined and a dent is found in the front of his forward mud guard. In carrying the victim into the car a few drops of his blood fell on the bumper or on the running board. The "samaritan" who took the victim to the hospital is strongly suspected of the commission of a crime committed by another. Many similar examples could be cited of equally plausible but erroneous deductions from circumstances.

relied on, the circumstances tending to show its existence must be *exclusive* in their operation, by demonstrating that no other person had, or could have had the opportunity possessed by the accused, and that, therefore, by a necessary consequence, none but he could have committed the crime. Its whole tendency is merely to show a *possibility* that the act might have been committed by the person supposed to be indicated; without any of that quality of positive *probability* in which the essence of the force of presumptive evidence resides . . . *Another* person may have been present. The real murderer may have left the dead body, and escaped from the room or the house in which it is found, only the moment before the accused entered it. The real incendiary may have fled from the building fired, only the moment before the accused approached it. The presence of the accused himself, on such an occasion, may be accounted for upon grounds of humane and laudable intention to render assistance, or mere innocent curiosity, or even mere accident. The *exclusive* character of the accompanying circumstances, in regard to *means and modes of entrance* upon and exit from the scene of the crime, however apparently satisfactory, *may not be real*. The murderer may have escaped from the room or house, by a door, or even a window, the existence or capacity of which has been entirely overlooked. . . . In a case of supposed murder the circumstance that the accused was the *last person seen* in company with the deceased, previous to his death or disappearance; or, in other words, that the deceased when last seen alive was seen in his company, does not, of itself, necessarily exclude the possibility that *another* and *unseen* person may have joined the deceased, after the accused left him, perpetrated the crime, and effectively escaped." [3]

---

[3] Wigmore, Ibid, p. 152, tells of the well-known case of Jonathan Bradford, who in 1736, kept an inn near Oxford. Hayes, a guest, mentioned to other guests that he had with him "a sum of money". Late at night two of these guests, hearing groans in the

This "possibility" *may* be what happened in the instant case. Nothing in this record excludes it. The court below says: "The decedent was killed by someone well known to him. No locks or windows were broken. A brown hat had mongoloid hairs on it. There was no evidence that any other mongoloid ever visited the decedent except the defendant." As to the first statement, there is not a particle of proof to support it. As to the second statement, the fact that "no locks or windows" of the victim's habitation "were broken" is of no significance whatsoever. The man who discovered the murder was Anthony C. Ciroalo, who called at Lee Joe's at 9:15 A.M. June 24, 1945 to get his laundry. He found "the door ajar and walked in and found Lee Joe on the floor, blood all over the bed and on him". As to the hat, Pang, a restaurant keeper, testified that on the evening of June 23rd, the defendant wore a brown hat which "looked like" Commonwealth's exhibit 19, which was the hat found on Lee Joe's bed with a red feather in it. The hat

---

next bed-chamber, entered it, and found Hayes "weltering in his blood in the bed and a man standing over him with a dark lantern in one hand and a knife in the other. The man seemed as petrified as themselves but his terror carried with it all the terror of guilt." The man standing over Hayes was Bradford, the inn-keeper. He explained that upon hearing the groans, he had snatched a knife to defend himself and had entered the room to investigate and that the terrors were the "natural effects" of "beholding a horrid scene". His explanation was not accepted. He was arrested, tried and hanged. Some time afterwards, it was established that the murder was committed by Hayes' footman who, upon stabbing his master, seized his money and escaped from the room "scarely two seconds before Bradford entered".

In Vol. 2, p. 21 of "Famous Trials of History", Lord Birkenhead tells of the case of William Habron, who was charged with the murder of a policeman. It was proved that he was in the vicinity of the murder, that he had made threats against the officer, and that his "muddy boots" fitted the tracks in the mud at the scene of the crime. Habron was convicted and sentenced to death; this sentence was later commuted to life imprisonment. Some time afterwards, a professional burglar named Charles Peace, confessed that as he was attempting to commit burglary in that vicinity, he was accosted by the officer and that he shot him and fled.

the defendant had on when Pang saw him had no feather in it. A taxi driver said he saw the defendant on June 21st wearing a new brown hat with a feather in it. He identified six and a half months later exhibit 19 as that hat. On the other hand, Dr. T. D. Beach, an employee of the Federal Bureau of Investigation, and a Commonwealth witness, who was called to testify to the human blood spots on the hammer, the bed-clothes and the linoleum, testified that the "mongoloid hair" he found in exhibit 19 was "the victim's hair". He compared the brown hat with a hat, exhibit 35, which was admittedly the defendant's. He said the brown hat was smaller than exhibit 35. Miss Williams, the maid who worked for Lee Joe, testified that she had seen her employer wear a brown hat.[4] Even if the brown hat had been the defendant's, the fact that it was found on the victim's bed would be of no incriminatory value. The defendant frequented Lee Joe's house and it might easily happen that on some occasion he left his hat there. This murder was committed in warm weather and it was testified to that Knee New was seen on the streets occasionally without a hat. The trial judge told the jury: "Whoever did it ran away and escaped. It may have been that the hat was left there in an endeavor to get away quickly, and the Commonwealth contends that it is the defendant's hat. If that is true . . ., how did it get there unless the defendant was there? That is very important indeed. The Commonwealth contends under the circumstances the defendant did commit this act, and that you ought not to hesitate to convict him in the manner and form as he stands indicted". The prejudicial character of this instruction is

---

[4] When, after the Assistant District Attorney, in his closing address, criticized the defense for not trying the brown hat on the defendant's head, counsel for the defendant, during his closing address, picked up the brown hat and was about to put it on the defendant's head in order to show that it did not fit, when the Assistant District Attorney objected to his doing so and the court sustained the objection.

self-evident. As to the statement about "no other mongoloid ever visiting the decedent", that fact, if true, is entirely irrelevant and immaterial.

What the trial judge said in his charge about the money found in the defendant's possession in New York City was likewise unjustifiable and prejudicial. He said: ". . . the Commonwealth contends that was the money that belonged to the deceased; that he had put away in the box; and the defendant knew it was there because the witness [Ethel M. Williams, a colored maid who worked for Lee Joe] testified she knew that he had a lot of money, and he paid her off [on June 23rd] and when he did she noticed the money that he had and mentioned a one-hundred dollar bill and fifty dollar bills." The Commonwealth claimed that "this is the money which he [the defendant] obtained as a result of inflicting the blows on the deceased." When at the close of the charge, defendant's counsel challenged that by saying: "that was never the contention of the Commonwealth", the court replied: "As a matter of inference. . . . This was perpetrated as a result of losses sustained by gambling. . . . Is that not the correct assumption as far as the money in the belt is concerned?" The District Attorney, Lessy, then answered: "Yes, your Honor".

There is not a particle of evidence supporting any such contention. Miss Williams had testified that the money she saw in Lee Joe's possession consisted of "some fives and twenties, fifties and a hundred". Detective Michael J. Horris of New York had testified that he found in the defendant's belt on June 27th, $1212.00, and when this money belt was received in evidence, it was found to contain "eleven $100 bills, one $50, two $20's and one $10 and nine $1 bills" (and some silver). The only legitimate inference is that these eleven bills of $100 denomination were the eleven bills of the same denomination the defendant had drawn from two banks 7 and 8 days previously. None of the money found in the belt was identified as Lee Joe's.

. In the Court's opinion refusing a new trial appears this statement: "After the defendant withdrew his money from banking institutions, and after he engaged in gambling enterprises, he attempted to raise money and succeeded in obtaining the sum of $10 from a friend in a hospital." There is nothing whatever in this record to support the theory that Knee New "engaged in gambling enterprises" and then returned to Chester to recoup his losses by robbing Lee Joe. The defendant testified that he played three games of mah jong in New York City on June 22, 23 and 24, that he was "even" in two games and in another game he won $30. Three Chinese witnesses corroborated his testimony as to this. There is nothing else in the testimony about his gambling. The theory that this defendant after his gambling in New York, was "broke" and came back to Chester to "raise money" hasn't a single fact to support it. Besides, the Commonwealth contends that the defendant *did not leave Chester for New York until after the murder of Lee Joe,* except for one day, June 20th, when he got his savings out of a New York bank and then returned to Chester.

The defendant gave this apparently candid explanation of his getting money from Tee Soy, when he spent a few hours with him in a Chester hospital on June 21st: He said: "He owed me money. I didn't ask him to return the money. He said he wanted to do it." The court in its opinion made this adverse comment on the defendant's testimony about the repayment of the loan: "On page 504 under direct examination, he testified Tee Soy gave him $30.00 on the day he visited him on Thursday at the Chester Hospital, and when he testified at page 576 that on that occasion Tee Soy gave him but $10.00 he then changed his testimony." The defendant on page 577 of his testimony said: "He [Tee Soy] gave me $30 on two times, $10 that day [June 21], $20 three or four days before that. He owed me $30." This testimony cleared up the "contradiction" which the trial judge

mentioned as one of the things indicative of defendant's guilt.

The Commonwealth's chief reliance in this case was the contradiction between what Knee New is alleged to have told the officers on June 28th in New York about his being with Lee Joe until 4:00 A.M. June 24th, 1945 and his leaving Chester at 10:30 A.M. that day, *and* his testimony that he left Chester about 1:00 A.M. Friday morning, June 22nd, and did not return until he was brought back. The fabrication of false and contradictory accounts by an accused is a circumstance that militates against him. See *Com. v. Lettrich,* 346 Pa. 497, 31 A. 2d 155. But this is not equivalent to saying that such evidence *is sufficient in itself to prove the guilt of an accused.* Those experienced in the administration of criminal justice know that sometimes an accused person will, although innocent, make statements contrary to the facts about his whereabouts at the time the crime was committed because the jury might believe that the connection between his whereabouts and the crime were *not* merely coincidental. This human trait has received recognition from jurists whose eminence was attributable as much to their common sense and their knowledge of the working of the human mind as it was to their legal learning. In *Com. v. Webster,* 5 Cush. 295, 316, Chief Justice SHAW called the jury's attention to the defendant's false and deceptive explanation and said: ". . . All or any of which tend somewhat to prove consciousness of guilt, and, when proved, to exert an influence against the accused. But this consideration is not to be pressed too urgently; because an innocent man, when placed by circumstances in a condition of suspicion and danger, may resort to deception in the hope of avoiding the force of such proofs." Chief Justice COCKBURN in *Moriarty v. R. Co.,* L. R. 5 Q. B. 319, said: ". . . It is evidence against a prisoner that he has said one thing at one time and another at another. . . . I do not say that it is conclusive; I fully agree that it should be put

to the jury with the intimation that it does not always follow, because a man, not sure he shall be able to succeed by righteous means, has recourse to means of a different character. . . ." Justice, afterwards Chief Justice, WHITE, speaking for the U. S. Supreme Court in *Bram v. U. S.,* 168 U. S. 532, 547, said (quoting from *Gilham's* case, 2 Moody, pp. 194-195) : "The human mind under the pressure of calamity, is easily seduced; and is liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail . . . the law will not suffer a prisoner to be made the deluded instrument of his own conviction." In *Toler v. State,* 16 Ohio St. 583, the Supreme Court of Ohio said: ". . . The defendant's case is often much weakened by an unsuccessful attempt to prove an alibi. . . . In many cases, however, a false defense of this nature is innocently interposed, under a mistake as to dates, or the order of events. In other cases the defense is true, and the evidence fails to establish it. But in no case can the attempt be held to involve an admission of crime, or the simple failure to establish it afford any presumption of defendant's presence at the time and place when and where the crime was committed."

It should be said in this defendant's favor that if he, on the witness stand, falsified as to his whereabouts on June 24, 1945, he did not do so when first interrogated by the officers, if what they testified to is true. Such falsification as is charged against this defendant is supposed to result from "consciousness of guilt". If Knee New killed Lee Joe, he must have been conscious of guilt immediately thereafter. Yet, according to the officers, he freely admitted to them on June 28th that he was with Lee Joe until 4:00 A. M. that day.

In support of his testimony that he was in New York at the time of the murder, the defendant called witnesses who testified that they played mah jong with him on Saturday night, June 23rd, in New York City. The testimony of these witnesses is far more convincing than the

testimony of those witnesses who said they saw him in Chester at that period. Three Chinese witnesses, one of them being How K. Chen (who had been in the U. S. armed forces nearly three years) testified in some detail that they had played mah jong with him in New York City during certain hours on June 22, 23 and 24, 1945; their testimony was not weakened on cross-examination. Opposed to their testimony was that of a colored waitress in a Chinese-American restaurant in Chester, who testified that she saw the defendant in the restaurant "between Thursday and Friday". She didn't know the date. She admitted that her knowledge was based "on what the cook told" her. Her testimony can, therefore, be disregarded. Lo Tei, the cook, said the defendant was in the restaurant on Friday evening. He said the defendant was accompanied by another Chinese, Ting Ah Soy. The latter, then in the court room, was identified by the cook as being the Chinaman he referred to, but Ting Ah Soy testified that he was a patient at the Chester Hospital on that Friday, and the hospital records corroborated him. Willie Pang said he saw the defendant in the restaurant at 10:50 P.M. Saturday, June 23rd. When asked when the detectives first interrogated him, he said it was "two weeks after", and at that time he stated he "couldn't remember". The defendant admitted that he was in this Chester restaurant on *Thursday*, June 21st, with two colored girls. The girls and others corroborated him. The defense argued that the witness who said he saw the defendant in the restaurant on *Saturday* evening, June 23rd, had confused Saturday night with the preceding *Thursday* night. For a witness to "think back" more than two weeks and be sure that he saw a man on a Saturday night at a certain place instead of on a Thursday night is a difficult feat of memory unless some circumstances fixed it in his mind. Willie Pang tells of no such fixing circumstances.

If this defendant was in Chester from June 22nd to June 24th it is strange that the Commonwealth could

produce only two "weak witnesses" to testify to that fact. If the defendant was in Chester Friday night, June 22nd he must have slept at his regular lodging house or elsewhere and someone should have seen him. No one places the defendant in any lodging house on either Friday or Saturday night and no one except Willie Pang places the defendant in any dining room on Friday or Saturday and Willie Pang claims to have seen him only late Saturday night. If the defendant dined in Chester on Friday or Saturday someone must have waited on him. No such waiter-witness appeared in this case. If the defendant had been with Joe Lee on Saturday, June 23rd, the latter's work-maid, Miss Williams, must have seen him. She testified about seeing the defendant in Lee Joe's on many occasions but said nothing about seeing him there on Saturday, June 23rd. If this defendant bought a ticket for New York on Sunday morning, June 24th, the ticket agent, if interrogated soon after Lee Joe's murder (as presumably he was), ought to have been able to remember selling a ticket to some Chinaman that Sunday morning. The ticket agent was not produced as a witness.

The most persuasive testimony that the defendant left Chester early Friday morning, June 22nd, as he said he did, was supplied by his landlady, Bessie Soifer. She testified that the last time she saw Knee New was "the Thursday afternoon [before the murder] between three and three-thirty". She said: "I saw him carrying out a big white bag like cement".[5] She said: "From that time

---

[5] The trial judge seemed to think that the fact that the defendant shipped his bags to New York on Thursday negates the defendant's statement that he left for New York about one o'clock Friday morning. The "argument" is that if the defendant went on that train, he would have taken his personal belongings with him. The size and shape of the bags as described by witnesses is a complete answer to that argument. He probably would have been denied admission to the train if he had been carrying such bags. These bags contained bed-sheets and pillow-cases, working clothes and other such articles.

I didn't see him until today but the remains of his stuff must have been in the room and the lock was on till ten-thirty that night". She was asked: "What happened at ten o'clock that night?" A. "I went to bed and I heard sometime in the middle of the night—I hear people coming up and down, but I never go out to see. The next morning I found the door unlocked and there was nothing in the room." It is a fair inference that the noise that the landlady heard in the middle of the night was Knee New taking his hand bags out of the room preparatory to going to New York on the 1:05 A.M. train Friday. His room rent was paid until Friday. Incidentally, this witness testified that: "You can barely make him understand; you explain the price and he may be able to pay you." She was called as a Commonwealth witness, but she greatly helped the defendant's case.

That Knee New shipped his personal belongings to New York on Thursday was established beyond question. Why he would remain in Chester three days longer does not appear. If he wanted to kill Lee Joe there is nothing to indicate that he could not have killed Lee Joe as easily on Friday morning as on Sunday morning. Calvin Lee, a Chinese friend of Lee Joe for ten years (and the administrator of his estate) said that he had often seen the latter carrying "a roll of money an inch thick", consisting of at least "one $100 bill and fifty and twenty, always had that". If the *defendant* knew of this and feloniously coveted it, the question arises, why didn't he rob Lee Joe on Friday or Saturday morning instead of waiting in Chester three days after he had given up his lodging and shipped his personal belongings to New York and visited his friend, Tee Soy, in the hospital and collected from the latter what was owed him and had entertained his girl friends in a restaurant on Thursday evening and then said goodbye to his friends and left (as they said) for New York? The answer that reason suggests to this question is that Knee New left Chester at 1:05 A.M. Friday for New York, exactly as he said he did. He had

gotten his money out of the bank; he had it secreted in his belt and he was ready for the deportation to China which he knew was inevitable.

The record raises a substantial doubt whether this defendant made to the officers in New York the admissions attributed to him, *with an intelligent comprehension of the questions asked him.* In saying this, no reflection is cast upon the honesty of the officers. They testified to an unrecorded interview with the defendant seven months after it occurred. Detective Horris, who did most of the questioning, was asked as to what the defendant's attorney said to him on *July* 28th at the extradition proceedings and he said he "would have to refresh his recollection from the minutes of that proceeding." Yet, the same officer testified as to the interrogation a month earlier, without any "minutes" of *that* proceeding. Detective Allen testified that Detective Horris "seemed to understand him [Knee New] better than anyone else and we told him to talk to him." This would indicate that there was considerable difficulty about the questioning. Detective Horris may have had to resort to leading questions in order to obtain the answers and Knee New may have nodded assent to these questions without realizing their import. It frequently appears in this record that witnesses testified to Knee New's assent to a question merely because he nodded his head. Foreigners who do not understand our language frequently nod their heads to indicate that they are at least trying to understand. It is not to be expected that a Chinaman who has been in this country a little more than two years could carry on a conversation in English. Apparently, it was hard for him to even tell about the kind of work he was engaged in for Detective Allen testified that Detective Horris "asked him what his work consisted of, and he tried to explain it to us, and we were a little confused, but thought he meant that he worked around a machine. He mentioned 'machine', and he mentioned

going around in such a place and we assumed it was a truck he was referring to, and we concluded he meant a machine." In other words, even to elicit the fact that the defendant worked around a machine, the detective had to "think" what he meant and had to "assume" something and finally had to "conclude" that he "meant" a machine.

Knee New, when examined in the extradition proceedings in New York on July 28th through an interpreter, was asked: "Were you able to understand the questions that they [on June 28th] put to you?" He answered: "I couldn't really understand them." At the trial he testified through an interpreter that in New York he didn't "answer a single question". He also said that one of the officers called him names and pushed him back and forth. P. M. Scheid, Assistant Foreman in the Machinery Division of the Sun Shipbuilding Company, said the defendant could not speak English. The Sun Shipbuilding Company employed a Chinese interpreter so as to facilitate the giving of orders to Chinese employees. Ella Yerkes testified that the defendant attended five or six times a class which she taught in Chester. She said: "I spent practically an hour endeavoring to teach him two English words." Catherine Mitchell testified that she tried to teach him English and "found it was hopeless". He attended the class about ten times and she had never heard him use any English word. Jean Shaw Scheid, another teacher, testified that she tried to teach him English and "didn't get anywhere with him". She was asked: "What did he say to you in English?" She answered: "Nothing". Thomas D. Nunn, Commonwealth's witness and the Delaware County fingerprint expert, testified that he interviewed the defendant in jail and he told about the difficulties of making him understand. When he asked the defendant: "Where do you live?" he had to ask it several times. He said: "I had to get it out of him in several questions." He also had to use the same technique in getting an answer to the question of whether the

defendant was married or single. When the witness was asked: "How did he indicate that he was married?", the witness answered: "He nodded his head to one of the questions which I asked him." The trial judge seemed to think that the fact that the defendant shook hands with the county detective and thanked him and said "goodbye" when the detective lodged him in jail after bringing him back from New York, indicated that the defendant could speak English. The trial judge said to the jury: "That is natural for a person who speaks English to do that. That is correct or not?" Saying "goodbye" no more proves one's command of English than saying "au revoir" proves one's command of French.

Two classes of persons readily give apparent assent to leading questions asked them, to wit, children and persons who do not understand clearly the language they are being interrogated in. For example, Detective Allen who knew of the half-filled bottle of beer found in Lee Joe's house may have suggested to Detective Horris this question: "Did you drink beer in Lee Joe's last Saturday night?" The defendant may have understood the words "drink" and "beer" and have nodded assent to the question, thinking it meant had he *at any time* drunk beer at Lee Joe's. He probably had drunk beer there many times. Lee Joe's maid testified as to seeing the defendant bring quart bottles of beer to Lee Joe's home on many occasions. The defendant might have been asked by the detective: "Did you take the 10:30 train from Chester to New York last Sunday?" He may have nodded assent to that thinking it meant had he *ever* taken the 10:30 train to New York. Perhaps he did not understand "10:30". The Captain of the Jail Guards said it was hard to make him understand the number of the cells. Commonwealth's witness, Knox, testified: "We couldn't make him [Knee New] understand." It is difficult to believe that when the officers asked Knee New if he would return with them to Chester and, as they implied, without extradition, that he understood what they meant.

The interrogation of a man charged with a crime, and particularly a capital crime, by officers who speak a language which the interrogated subject only partially understands, without notifying the accused of his rights, without anyone being present to protect his interests, and without there being a stenographic record made of the questions and answers, is a practice which degrades the administration of justice and we condemn it.

The trial judge prejudiced the defendant when he said to the jury: "Some said he [the defendant] didn't appear with the deceased on Saturday night, but it is my recollection that he said he did. The jury will recollect as to that, that he, the deceased, was there on Saturday night, with him, the defendant, ten minutes of eleven o'clock. I so have it in my notes, but it is your recollection that controls. He saw him there. I am quite sure he said that he saw the deceased there sometime . . . you will pass upon it as you recall it." The trial judge thus, *according to his notes*, is "quite sure" the defendant and the deceased were together 70 minutes before midnight on Saturday night. As the jury took *no* notes they would be likely to accept the trial judge's "notes". At the close of the charge, both defendant's counsel and the district attorney called the judge's attention to his error. The district attorney agreed that there was *no* such testimony. The judge simply said that "the recollection of the jury would control". This could not erase the effect of his mis-statement and did not "cure" the error.

In the face of the Commonwealth's inconclusive evidence and the defendant's persuasive alibi, the jury would probably have acquitted the defendant if they had received proper instructions. For example, when a defendant sets up an alibi, it is *not* sufficient to tell the jury merely that the Commonwealth has (quoting from the charge) "to prove the guilt of the defendant beyond a reasonable doubt, and when the defendant sets up a defense in this case of alibi then it not only should receive

your careful consideration but you must be satisfied by the weight of the evidence that he has made out his defense, not beyond a reasonable doubt as far as an alibi is concerned, but satisfied by the weight of the evidence or the preponderance of the evidence that he was not present", but a trial judge *must also,* as we said in *Com. v. Jordan,* 328 Pa. 439, 196 A. 10, speaking through Justice Stern, fully advise the jury "as to the difference between the burden resting upon the Commonwealth to establish guilt, and that resting on the defendant with respect to the alibi set up" so that the jury may be "furnished with a standard for determining the legal value of the evidence". The jury must also be instructed that "the evidence in support of the alibi may, with other facts in the case, raise the reasonable doubt of guilt which entitles a defendant to acquittal". (Citing many cases). The charge before us fell far short of these requirements. For example, the trial judge said: "His defense is that he was not there and remained in New York all of the time. If you are satisfied that he did, of course, that is his alibi, and he was not there. It is not that the defendant is trying to convince you that the murder was not committed. It is a sort of a confession and avoidance as we recollect, that is as far as the evidence is concerned; that admitting that it was committed, it was not committed by the defendant; he was not present." The phrase "confession and avoidance" was improper and prejudicial. It may have conveyed to the jury the impression that the defendant had "confessed" the murder and was endeavoring to "avoid" the consequences. "Confession and avoidance" is a plea and a phrase which has no proper place in any criminal trial.

The Court also said (addressing the defendant's counsel): "The jury has to be satisfied by the weight of the evidence that you made out an alibi. That burden is with you, the defendant. I say that all through the case the burden is on the Commonwealth to satisfy the jury beyond a reasonable doubt, but when you set up an alibi,

the Commonwealth, having made out its case, showing murder in the first degree, and the fact of the murder of the man is uncontradicted, the burden is upon you to satisfy the jury by the weight of the evidence that you were not there." Later, the Court said: "The burden is upon the defendant to thus satisfy you by the weight of the evidence. The burden at the same time is upon the Commonwealth to satisfy you beyond a reasonable doubt inclusive of evidence of everything, of the guilt of the defendant, but when they set up an alibi which is in effect: 'We don't know about it; we were not there,' or words to that effect, you have to be satisfied that he was not there." Nowhere in the charge did the Court make it clear to the jury that the evidence as to an alibi may generate in the minds of the jury a reasonable doubt of the defendant's guilt, except the vague phrase above quoted: "inclusive of evidence of everything". A comparison of the foregoing excerpts, with what this court so clearly said in *Turner v. Com.*, 86 Pa. 54, 73, (a murder case based on circumstantial evidence), about "proof of an alibi" being "as much a traverse of the crime charged as any other defense, and proof tending to establish it, though not clear may, nevertheless, with other facts of the case, raise enough doubt to produce an acquittal", will reveal the prejudicial inadequacy of the trial judge's charge as to defense of alibi in the instant case.

The Court also said: "The Goddess of Justice is holding the scales, and she is blindfolded, and she doesn't know who is before her; she is just tipping those scales from the weight of the evidence, and as the weight of the evidence tips the scales, so your verdict should be." This was prejudicial error. In a criminal case, the Commonwealth cannot obtain a conviction on evidence which "just tips the scales"; it must present evidence weighty enough to convince the jury beyond a reasonable doubt of the guilt of the accused.

The trial judge in his charge also said: ". . . our charge must of necessity be lengthy, because of the seri-

216

ousness of the charge, and so that this man will have a chance for his life, if there is a chance for him, and we are giving him the full benefit of the guarantees to which he is entitled under our constitution and the laws of our land." That certainly was not giving the defendant the "full benefit" of the "presumption of innocence" which belonged to him. The phrase "if there is a chance" carried an implication that it was doubtful if the defendant had a chance for his life. At no stage of a criminal trial does a judge have any right to put such a "fatal" handicap on a defendant.

The district attorney and the trial judge list certain things as "pertinent evidence against the accused". Samples of this "pertinent evidence" are the following in quotation marks: (1) "Cigarette stumps found in the bedroom; no evidence that any other person who was known to the deceased, except the defendant, smoked cigarettes." Smoking is not such an uncommon practice that this defendant can be connected with this murder by "cigarette stumps". How long these stumps had been in that bedroom does not appear. (2) "The deceased was undressed for bed". How this fact connects the defendant with the murder is left to the imagination. If a burglar entered Lee Joe's house to rob and murder him on the morning of June 24th, he presumably found the victim in bed. (3) "No person testified he ever saw defendant with a large sum of money on his person except at the time of his arrest." The lawful origin of every dollar of that money was accounted for; apparently the defendant had earned and saved it. (4) "When defendant was arrested, he denied he had any money on his person, except several dollars, but a large sum of money was found on his person in a money belt after he was physically searched." His denial in no way showed his guilt of murder. The defendant knew he was to be deported to China as an "illegal entry" into the United States. He may have feared that if he revealed his savings they would be confiscated, and he was under no obli-

gation to reveal them to anyone. (5) "Knee New was illegally in the United States and immigration officials were conducting a raid on persons unlawfully in this country, of which the defendant had knowledge." It is impossible to understand how that fact connects the defendant with the murder of Lee Joe. (6) "He was asked whether he wore overalls at the Sun Ship, and he said he did not know". He may have been unfamiliar with the word "overalls". The record shows that the defendant's range of English words was very restricted. The defendant spoke the "Fuchow dialect" of Chinese and the interpreter who was finally obtained in this case had some difficulty in interpreting and so stated. (7) "He testified on page 538 'I don't know anything. I generally follow what people did.'" The record shows that the defendant made the answer just quoted when being asked on cross-examination if he knew why he put his hand on the book [the Bible] when he was sworn as a witness. His answer was apparently an honest one. (8) "He testified that the last day he worked at the Sun Shipyard was June 18, 1945, and was asked on cross-examination whether or not he didn't use the words '1945' to which he testified: 'No, I didn't say that.'" The fact is that this answer was true. It was apparently the interpreter who added "1945" after the defendant said "June 18". (9) "He said he got the book [in the American language] because he liked to see the pictures, and yet when he was asked what the pictures showed, he said he did not know." There is no proof that he did know. (10) "He was asked whether he knew where the Bowery was on the East Side to which he replied: 'I don't know what the Bowery Street is',". He probably did not know; many Americans do not. (11) "He did not know whether he played mah jong with Ah Hing or not, and yet used him as an alibi." The trial judge is mistaken about this. The defendant testified that he played mah jong in New York on June 22nd with Ah Hing. The trial judge evidently confused Ah Hing with Ah Hung. The latter was a New York friend of

218

the defendant. (12) "The defendant testified he did not know where Joe Lee kept his money, and the condition of the deceased's place showed that it was ransacked". It is difficult to understand how these two facts incriminate the defendant. If *someone else* killed Lee Joe, he also presumably did not know where the latter kept his money. (13) "He did not remember whether he had told the officials that he had a wife, he did admit he had a wife, under further cross-examination, and admitted he had a son." What relevancy this has to the fact in issue does not appear. (14) "When the defendant was confronted with the application that he signed at the Sun Ship for employment, he was asked whether or not the application was not signed by him, and he said at page 636 'I was told by man who put pencil into my hand and move my hand along.'" How that answer discredits Knee New is not explained. The application, which is in the record, shows the name "Knee New" evidently printed with great difficulty and in the wrong place on the application. This defendant was tried for murder, not for illiteracy.

In the opinion refusing a new trial, the court below said: "If all it showed in this case was the killing of the deceased under circumstances which indicated robbery at a time when the defendant admitted he was in the presence of the deceased, and the subsequent flight of the defendant to another jurisdiction, a prima facie case of murder was proved, which, if believed by the jury could sustain a conviction of murder in the first degree."

That excerpt reveals the fundamental error in this case. The defendant did *not* admit that he "was in the presence of the deceased" when the latter was killed. Second, there is in this case no evidence of the defendant's "flight to another jurisdiction". An individual who departs from a certain city a few hours after a murder is committed in that city does not thereby become a "fugitive in flight to another jurisdiction". (The preponderance of the evidence is that the defendant left Chester at

least fifty hours before the murder.) A man is not fleeing from justice until he knows that justice is looking for him or fears that justice is about to look for him. Even if it was 10:30 A.M. June 24th when Knee New left Chester for New York, there is no evidence whatever that he then knew that his friend had been murdered and that he was suspected of the crime. Knee New had formerly resided in New York. He had relatives and friends there and since he knew that he would eventually be deported to China, it was reasonable for him to withdraw his savings from the banks and seek out his relatives and friends in New York for farewell visits with them. He did not attempt to change his name or go into hiding. New York with its twenty thousand policemen and detectives is not a place which a "fugitive from justice" is likely to select as a "hideout". The fact that he did not waive extradition and return to Chester voluntarily is no evidence of his guilt. He was within his rights in not waiving extradition and he was apparently acting on advice in so doing for he had an attorney at that time. Many accused persons whose guilt is later established waive extradition. Just as such a waiver of extradition is no evidence of innocence, so resistance to extradition is no evidence of guilt.

If the Commonwealth's evidence as to what Knee New said to the officers in New York on June 27th, 1945, shall be accepted as true, the Commonwealth proved only that Knee New was on the morning of June 24th, 1945, in such close proximity to Lee Joe that he had an *opportunity* to murder him. But the Commonwealth failed to prove that such an opportunity was *exclusively* the defendant's and that no one else could have entered Lee Joe's habitation for the same felonious purpose.[6] The Commonwealth

---

[6] There are two cases in other jurisdictions in which the highest courts held that the circumstantial evidence was totally insufficient to convict. In both cases, the facts were stronger against the defendant than they were in the instant case. In *Com. v. Curtis*, 63 N. E. (2) 341, the defendant had an "opportunity" to kill the de-

220

did *not* prove that the defendant knew that Lee Joe had a large sum of money in his possession on June 24th. It did prove that the maid knew it. No suspicion of guilt has fallen upon this maid but she may have inadvertently told others of Lee Joe's possession of "a roll of bills one inch thick", as she described it. It is in evidence that Lee Joe often displayed his roll of bills to other'persons. All the circumstances proved by the Commonwealth are consistent with the theory that some person as *yet unknown*, entered Lee Joe's habitation on the morning of June 24th and killed him.[7] Unfortunately, robberies and murders like that of Lee Joe have been almost of daily

ceased and there were declarations of the defendant which the prosecution contended indicated a consciousness of guilt. The Supreme Judicial Court of Massachusetts in holding that the trial court had erred in not directing a verdict of not guilty said: "Evidence which does not go beyond showing that the defendant had an opportunity to commit the crime is insufficient. The question of guilt is 'left to conjecture or surmise and has no solid foundation in established facts.' " (Citing several cases.)

In the case of *People v. Holtz*, 294 Ill. 143, 128 N. E. 341, a woman and her aunt were prosecuted for the murder of the wife's husband and the wounding of the aunt's husband. Both were shot at 4:00 A.M. in the house where both couples resided. The murder weapon was the wounded man's gun. Both women were convicted by a jury and sentenced to imprisonment. The defense was that the evidence did not exclude the possibility of an intruder in the house. The Supreme Court of Illinois said that all the evidence proved was "that a murder was committed, that Mrs. Holtz was present when her husband was shot and that Mrs. Whisman was in the house. It does not connect them otherwise with the fact of the shooting or show that the crime was not committed by some other person. Being present they had the opportunity to commit the crime, but opportunity, alone, is not sufficient to justify a conviction even though they are unable to show who did commit it. The burden still rests upon the prosecution to show, beyond a reasonable doubt, that the crime was actually committed by them and not by some other person."

[7] If later some burglar should be apprehended and should confess that it was he who robbed and murdered Lee Joe, it would be apparent to all how consistent with Knee New's *innocence*, are all the circumstances presented by the Commonwealth in this case. See paragraph 2 of footnote 3, page 201, supra.

occurrence in the metropolitan areas in this country during the past year or longer. It was not necessary for this defendant, in order to be acquitted, to identify the unknown who may have committed this murder. It was the duty of the Commonwealth in order to obtain the accused's conviction to show circumstances that are consistent only with the hypothesis of his guilt. Since the Commonwealth failed to do that, it was the trial judge's duty to direct the jury to find him not guilty. In *Com. v. Harman*, supra, Chief Justice GIBSON instructed the jury that they should not convict unless they were convinced of the defendant's guilt "beyond a reasonable doubt" and could not reconcile the evidence "to any reasonable hypothesis of innocence." In *Pauli v. Com.*, 89 Pa. 432, this court, in an opinion by Justice PAXSON, enunciated two principles which are applicable to this case: (1) That it is *not* necessary for the jury in order to acquit a defendant to "find a theory that conclusively establishes his innocence". (2) There is "no doubt that in favor of liberty of the citizen, the court may, and in a proper case, should, declare the evidence insufficient to convict."

When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty. When a party on whom rests the burden of proof in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither. The evidence in this case was utterly insufficient if submitted under adequate and proper instructions to convince an intelligent and fair-minded jury of the defendant's guilt to a moral certainty so strong as not to be weakened or disturbed by any reasonable doubt.[8]

---

[8] In *Coffin v. U. S.*, 156 U. S. 432 at 454, Justice WHITE, speaking for the United States Supreme Court, quotes with approval from the

Not only was the Commonwealth's case too weak to warrant its submission to the jury but also, in fairness to the defendant, it should be pointed out that the following circumstances "speak loudly" in support of his innocence: (1) Though the blood of Lee Joe was spattered over the pillows and bedsheets and elsewhere, there is no testimony that a single blood spot was found on the clothes of the defendant when he was taken into custody on the day following Lee Joe's murder. (2) Whoever wielded the murder weapon, a hammer, must have had his fingers encased in gloves for no finger marks were found on the handle.[9] It is not likely that Knee New was sufficiently schooled in crime to take the precaution of encasing his fingers in gloves. He had no criminal record. (3) American witnesses testified to the defendant's good reputation.[10] Assistant Foreman Scheid said of the defendant's reputation: "I might say it was excellent. We always found him a good, loving character. His reputation for telling the truth was good and also for peace and order." (4) Though Knee New was preparing to go back to China, knowing that his services were no longer needed in this country and that his deportation was inevitable, and though he was taking his savings out of the bank and secreting them on his person preparatory to leaving this country, not one dollar of Lee

---

Roman law the following maxim of criminal administration: " 'Let all accusers understand that they are not to prefer charges unless they can be proven by proper witnesses or by conclusive documents, or by circumstantial evidence which amounts to indubitable proof and is clearer than day'." "Code, L. IV, T. xx, 1, 1. 25."

[9] The only finger prints found were on a bottle and on a glass. These were the finger prints of Lee Joe's housemaid.

[10] The trial judge said to the Jury: "However, evidence of good character is of no avail against positive proof of crime." This statement was prejudicial to the defendant. The Commonwealth offered no "positive proof" of the defendant's guilt of the crime charged. As to what are proper instructions on character testimony, see *Com. v. Tenbroeck*, 265 Pa. 251, 255, 108 A. 635.

Joe's money was found in his possession. He had no motive for killing Lee Joe and he possessed none of the fruits of the crime.

The judgment of the court below is reversed and the sentence imposed is vacated and it is ordered that the record be remitted to the court below forthwith and that upon its receipt by that court the latter direct the immediate discharge from custody of the prisoner indicted, convicted and sentenced under the name of Woong Knee New.

It is also ordered that the sum of $1212.00 taken from the possession of the defendant when he was charged with the murder of Lee Joe be returned to him when he is discharged from custody and that his personal receipt therefor be taken and filed with the record of this case in the court below. The defendant's signature to the receipt shall be witnessed by at least one of the judges of the court below.