J-S15009-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| JOHN VALENZUELA | |
| Appellant | No. 3489 EDA 2015 |

Appeal from the Judgment of Sentence June 26, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007911-2011

BEFORE:  BOWES, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY BOWES, J.:                         **FILED JUNE 27, 2017**

John Valenzuela appeals from the judgment of sentence of eleven and one-half to twenty-three months incarceration followed by a consecutive period of five years probation, which was imposed following his jury conviction of one count each of statutory sexual assault and corruption of minors.  His sole claim on appeal challenges the sufficiency of the evidence establishing that the victim was under sixteen years of age for purposes of the statutory sexual assault crime.  We affirm.

The Commonwealth adduced the following facts at trial.  S.R., born October 16, 1993, testified that she lived with her biological father and stepmother from age nine until 2008, her freshman year of high school, when she moved in with her mother, Blanco Soto.  N.T., 7/16/14 (a.m.

session), at 75. She started her freshman year at Maryanne Academy but transferred early in the school year after moving to her mother's residence on Phillips Street. *Id*. at 74. S.R. began taking classes at Edison High School, and graduated from that institution in June of 2012. *Id*. Appellant, who was Ms. Soto's boyfriend, lived in the Phillips Street home.

S.R. stated that she got along with Appellant at first, but one day he kissed her "kind of like [how] you give a hand shake" at the end of a conversation. *Id*. at 80. She thought this was strange, but wrote it off as an accident. However, Appellant's behavior escalated. He would rub against her, grab her buttocks, and profess his love for her. *Id*. at 82. One day, while S.R. was on her bed, he asked her to have sex. She refused, and he offered her $100. She again refused, so he put the money under her pillow, took off her clothes, and inserted his penis into her vagina. *Id*. at 84-86. He ejaculated into a towel and left the room. This incident occurred when she was fifteen years old. Appellant thereafter had sex with her "at least twice a month . . . mainly whenever he got the chance." *Id*. at 89. S.R. stated that these incidents started after her mother quit working. *Id*. at 84.

Appellant later moved to a home on Hurley Street. Sometime between the age of sixteen and seventeen, S.R. and her mother moved in as well. S.R. stated that the abuse continued to occur at Hurley Street, and ended sometime in February of 2011, when she was a junior in high school. *Id*. at 92.

The allegations came to the attention of authorities on May 2, 2011, when one of S.R.'s friends, in whom S.R. confided, reported the allegations to Sarah Broder, a counselor at the high school. Ms. Broder spoke to S.R., who initially denied that anything happened, but eventually confirmed that Appellant had abused her. *Id*. at 53. Ms. Broder called the Department of Human Services, who sent a social worker to interview S.R. Following that interview, the social worker called the police. Officer Sean Burnett testified that he prepared an incident report on May 2, 2011, in which S.R. related that "[Appellant] had been raping her and sexually assaulting her for approximately two years." N.T., 7/17/14 (p.m. session), at 77-78.

Appellant was charged with rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, statutory sexual assault, sexual assault, and corruption of minors. The jury returned guilty verdicts at the counts of statutory sexual assault and corruption of minors, and not guilty verdicts at all other counts. Appellant received a sentence of eleven and one-half to twenty-three months incarceration for the sexual assault, and a consecutive five year period of probation at the corruption of minors count.

Appellant filed a timely notice of appeal, and Appellant and the trial court complied with Pa.R.A.P. 1925. He raises one issue for our review:

> Where the complainant advised a worker from the Department of Human Services and a school counselor that she was sixteen years old when her complaint of sexual abuse was first made

- 3 -

and her trial testimony was equivocal on this point, did the Commonwealth fail to prove the age element in a statutory sexual assault case, pursuant to 18 Pa.C.S. § 3122.1?

Appellant's brief at 2.

Appellant's offense was graded as a felony of the second degree. The statutory language for that crime reads:

> **(a) Felony of the second degree.--**Except as provided in section 3121 (relating to rape), a person commits a felony of the second degree when that person engages in sexual intercourse with a complainant to whom the person is not married who is under the age of 16 years and that person is either:
>
> > (1) four years older but less than eight years older than the complainant; or
> >
> > (2) eight years older but less than 11 years older than the complainant.

18 Pa.C.S. § 3122.1. The only element challenged in this appeal is the age requirement. Thus, Appellant does not contend that the jury could not credit S.R.'s testimony that sex occurred; rather, he maintains that the jury could not credit her testimony regarding **when** that sex first occurred. "As is obvious from a brief review of the definitions, the offenses require proof that the victim was less than 16 years of age at the time the offense was committed." *Commonwealth v. Hooks*, 921 A.2d 1199, 1202 (Pa.Super. 2007) (holding that person reaches age of sixteen on anniversary of birthday, not the day before the birthday as under common law). Since S.R. was born on October 16, 1993, the Commonwealth was required to prove that Appellant had sex with S.R. on or before October 15, 2009.

Whether the evidence was sufficient to support the conviction presents a matter of law; our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Walls***, 144 A.3d 926, 931 (Pa.Super. 2016) (citation omitted). In conducting our inquiry, we

> examine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, support the jury's finding of all the elements of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden by means of wholly circumstantial evidence.

***Commonwealth v. Doughty***, 126 A.3d 951, 958 (Pa. 2015). As a general proposition, evidence is sufficient to prove an element of a crime if a witness credibly testifies to the existence of that element. Thus, the testimony of a sex crime victim, standing alone, is sufficient to convict. "This Court has long-recognized 'that the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant, despite contrary evidence from defense witnesses.'" ***Commonwealth v. Charlton***, 902 A.2d 554, 562 (Pa.Super. 2006) (quoting ***Commonwealth v. Davis***, 650 A.2d 452, 455 (Pa.Super. 1994)). The Commonwealth urges us to apply this familiar principle by holding that the jury could credit S.R.'s testimony that sex occurred when she was fifteen.

Appellant counters that this principle does not apply herein because of what our Supreme Court has described as an exception to our normal mode of review. "We have, however, made exception to the general rule that the

jury is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture." *Commonwealth v. Smith*, 467 A.2d 1120, 1122 (Pa. 1983). "Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." *Id*. (quoting *Commonwealth v. Farquharson*, 354 A.2d 545, 550 (Pa. 1976)).

Appellant points to the following circumstances in support of a finding that the evidence establishing when sex occurred was so unreliable and/or contradictory as to make any verdict unlawful. With respect to the first time Appellant kissed her, S.R. was asked, "Do you remember what grade you were in when that happened?", she replied, "I think I was still in ninth grade." The prosecutor then asked, "Okay. So you're still 15, right?" to which S.R. replied, "Yes." N.T., 7/16/14 (a.m. session), at 80. After S.R. discussed the first time she and Appellant had sex, she was asked a similar set of questions and gave similar answers.

> Q. And do you remember what grade you were in when that incident that you just told us about happened?
>
> A. I believe I was still in ninth grade.
>
> Q. So you're still 15?
>
> A. Yes.

- 6 -

Q. And the incident that you just described is that the first actual sexual intercourse that happened?

A. Yes.

*Id*. at 85.

On cross-examination, Appellant impeached S.R. with prior inconsistent statements. S.R. agreed that she told Officer Graham that the first time Appellant had sex with her was when she was fourteen. N.T., 7/16/14 (p.m. session), at 21. She explained this discrepancy by saying she was "a year off." *Id*. Appellant also agreed that when Dr. McColgan asked her when the first time anything sexual happened, she responded, "I can't remember the first time it happened." *Id*. at 23. Additionally, Appellant introduced S.R.'s preliminary hearing testimony given under oath. S.R. reviewed the transcript and agreed she testified that the first time she had sex with Appellant was in the summer of 2009. *Id*. at 24. Finally, Appellant points to the following exchange on redirect examination:

Q. [S.R.], talking about this case, and everything, are you clear on the dates that any of this happened?

A. No.

Q. You talked today about you were 15 years when it started?

A. Yes.

Q. Are you certain you were 15 when you moved into the house on Phillip Street?

[APPELLANT]: Objection.

THE COURT: Overruled.

The witness: I don't remember.

*Id*. at 49.

Appellant does not rely solely on S.R.'s own testimony in making this claim. He notes that the social worker who interviewed S.R. at the high school related that S.R. said the first time anything sexual happened was in October of 2009. N.T., 7/17/14 (a.m. session), at 17. He also highlights that S.R.'s mother, Ms. Soto, was not certain when S.R. moved in to the Phillips Street home. Moreover, he points out that Ms. Soto was uncertain when she quit working, and, since S.R. stated the abuse occurred only after Ms. Soto stopped working, the Commonwealth could not pinpoint when the abuse started. Taken together, Appellant maintains that the inconsistencies and uncertainties within S.R.'s own testimony, paired with these other points, demonstrate that she was not certain if sex occurred before she turned sixteen. In short, he avers that if the victim herself was not certain when sex first occurred, the jury certainly could not be.

Turning to the law, Appellant relies upon *Commonwealth v. Woong Knee New*, 47 A.2d 450 (Pa. 1946), and *Commonwealth v. Karkaria*, 626 A.2d 1167 (Pa. 1993), cases which discharged convictions on sufficiency grounds by applying the exception and discarding our normal deference to jury's determinations of credibility. We examine each before reviewing Appellant's arguments in light of these authorities.

- 8 -

In **Knee New**, **supra** our Supreme Court discharged a homicide conviction on the grounds that the evidence was so unreliable that it could not support guilt. Therein, a Chester County laundromat owner named Lee Joe was found dead in a pool of blood on his bedroom floor at 9:15 a.m. on June 24, 1945. Woong Knee New was friendly with Lee Joe and visited him once or twice a week. Knee New was arrested in New York the day after the murder and told detectives that he had left Chester on June 24. Knee New further told the police that he had last seen Lee Joe on June 24 around 4:00 a.m. A jury convicted Knee New of homicide.

The only concrete facts that the Commonwealth offered to justify the conviction were Knee New's admitted presence with Lee Joe the night before the murder, and testimony that Lee Joe's time of death was between 2:30 a.m. and 4:30 a.m. The Court found that the latter fact was not actually established, as the testifying physician admitted that the timeframe was an approximation and was largely conjecture based on rigor mortis. Therefore, the Court found no firm support for the time of death. Turning to the former fact, the Court stated, "If it is accepted as a fact that this appellant was at Lee Joe's habitation at 4:00 A.M. June 24, 1945, and since there is no evidence that anyone else was seen with the victim between 4:00 A.M. and the time his body was discovered, suspicion naturally falls upon this appellant, but suspicion is never accepted in a court of justice as a substitute for proof." **Id**. at 457.

We now address ***Karkaria***.  Therein, Karkaria was convicted by a jury of forcible rape pursuant to a private complaint approved by an administrative judge after the Allegheny County District Attorney declined to file charges.  Karkaria was alleged to have raped his stepsister, S.F., who was fourteen years old at the time of trial.  The criminal charges specifically required the Commonwealth to prove that a rape occurred sometime between April 9, 1984 and September 19, 1984.[1]

The rapes allegedly started in 1981 when Karkaria, then sixteen years old, would babysit S.F., then eight.  The victim testified that Karkaria raped her over 300 times, that the rapes always occurred on the weekend when Karkaria acted as babysitter, and that the rapes always took the same exact form.  She also testified that the appellant's biological brother, who lived with Karkaria's biological mother, was never present for these rapes. The evidence established that Karkaria's father and S.F.'s mother had a troubled and distant relationship, and S.F. admitted that she did not like her stepfather.

The ***Karkaria*** Court found that the evidence was so inherently unreliable as to preclude a conviction.  The Court noted that other evidence proved that Karkaria and his brother were together every weekend pursuant

---

[1] These dates were selected because Karkaria turned eighteen on April 9, 1984 and could be prosecuted as an adult.

- 10 -

to a custody agreement. S.F. agreed that was true, but then explained that the rapes occurred at some other time, yet failed to specify when. The Court identified a number of other problems with the evidence:

In order for the jury in this case to have concluded that [S.F.] was forcibly raped by [Karkaria], the jury would have had to conclude that the child had been forced to submit to sexual intercourse at least once between April 9, 1984 and September 19, 1984. Since there was no direct evidence of sexual intercourse between those dates, the jury in order to convict, would have had to conclude, beyond a reasonable doubt, that the child had been forced to submit to sexual intercourse over 300 times, without ever feeling pain, without any physical evidence to support the contention that she was so victimized, and without any specific recollection by [S.F.] as to a date certain upon which even one of the several hundred assaults occurred.

. . . .

[S.F.]'s testimony as to when any particular act of rape occurred is disturbingly vague. She initially insisted that the assaults only occurred on Friday or Saturday evenings. She also maintained that [the brother] was never present when the assaults occurred. However, when confronted with her own testimony that [he] was in her home every other weekend from Friday evening to Sunday evening and that on the alternate weekends [Karkaria] was not in the home, she testified that the assaults occurred at another time. However she failed to specify when that particular opportunity arose. [S.F.] steadfastly maintained that the assaults only occurred when [Karkaria] was babysitting, and, as she testified that her parents only went out on Friday or Saturday evenings, that would have been the only opportunity for [Karkaria] to have assaulted her.

**The most striking inadequacy in the Commonwealth's case however, is the fact that [S.F.] insisted that the assaults only occurred when [Karkaria] was babysitting and yet she also admitted that during the time period charged in the indictment (April through September 1984), [Karkaria] no longer acted as the babysitter**. This

- 11 -

point is extremely troublesome when considered along with [S.F.]'s description of the numerous rapes.

*Id*. at 1171 (emphasis added).

We find that the inconsistencies and discrepancies cited by Appellant herein fall well short of the extraordinary circumstances examined in *Knee New* and *Karkaria*. *Knee New* is readily distinguishable, as the Commonwealth lacked any direct evidence linking Knee New to the crime. The only testimony placing Knee New with the victim on the day of the murder came from Knee New's answers to police officers in New York. In this regard, we note that *Knee New* predates *Miranda v. Arizona*, 384 U.S. 436 (1966). As quoted *supra*, the Court hesitated to accept that Knee New was actually with Lee Joe at 4:00 a.m. on June 24, since the source of that fact was Knee New's responses to questions posed by police officers. The Court explained at some length its skepticism that Knee New, an immigrant who had been in the United States less than two years, actually understood the questions asked of him:

> The record raises a substantial doubt whether this defendant made to the officers in New York the admissions attributed to him, with an intelligent comprehension of the questions asked him. In saying this, no reflection is cast upon the honesty of the officers. They testified to an unrecorded interview with the defendant seven months after it occurred. Detective Horris, who did most of the questioning, was asked as to what the defendant's attorney said to him on July 28th at the extradition proceedings and he said he 'would have to refresh his recollection from the minutes of that proceeding.' Yet, the same officer testified as to the interrogation a month earlier, without any 'minutes' of that proceeding. Detective Allen testified that

Detective Horris 'seemed to understand him [Knee New] better than anyone else and we told him to talk to him.' This would indicate that there was considerable difficulty about the questioning. Detective Horris may have had to resort to leading questions in order to obtain the answers and Knee New may have nodded assent to these questions without realizing their import. It frequently appears in this record that witnesses testified to Knee New's assent to a question merely because he nodded his head. Foreigners who do not understand our language frequently nod their heads to indicate that they are at least trying to understand.

. . . .

**The interrogation of a man** charged with a crime, and particularly a capital crime, **by officers who speak a language which the interrogated subject only partially understands, without notifying the accused of his rights**, without anyone being present to protect his interests, and without there being a stenographic record made of the questions and answers, **is a practice which degrades the administration of justice and we condemn it.**

*Id*. at 462-65 (emphases added). Indeed, Knee New's employer confirmed that the company employed an interpreter and that Knee Knew could not speak English. Since this case predates *Miranda*, the Court obviously did not apply that case and did not deem the confession inadmissible as the product of an involuntary statement, but its condemnation certainly tracks the broad outline of *Miranda*. Therefore, the evidence linking Knee New to the crime was so extraordinarily weak that the conviction could not stand. It is self-evident that the facts *sub judice* do not come close to those extreme circumstances and the case is inapposite.

*Karkaria* represents a closer case since the conviction, like the one at issue herein, involved a sex crime. Furthermore, unlike *Knee New*,

- 13 -

*Karkaria* did involve direct evidence that, if credited, would sustain a conviction. However, we find that the facts herein are distinguishable. The *Karkaria* Court observed that the "most striking inadequacy" in the Commonwealth's case was the fact that the victim insisted all of the rapes occurred only when the defendant was acting as babysitter, yet she simultaneously admitted that the defendant had stopped babysitting her by 1984, the time alleged in the criminal complaint. *Karkaria*, *supra* at 1171. Thus, the victim's **own** testimony affirmatively disproved the allegations of rape for the dates charged in the criminal information. Additionally, *Karkaria* deemed the timing of S.F.'s complaints relevant to its unreliability analysis. "The timing of these initial complaints to law enforcement authorities coincide precisely with the pending reconciliation of her mother and stepfather. This fact is important in light of [S.F.]'s repeated expressions of hatred for her stepfather." *Id*. at 1171.

S.R., in contrast, did not testify that sex occurred only after she was sixteen. Moreover, S.R.'s allegations came to the attention of the authorities because S.R.'s classmate, to whom S.R. confided, informed a school counselor. Hence, *Karkaria* is similar in kind, but remarkably different in degree.

Having concluded the cases relied upon by Appellant are distinguishable, we now review Appellant's arguments to determine if extraordinary circumstances nevertheless justify our departure from our

normal mode of sufficiency analysis. Appellant emphasizes that S.R. admitted that she gave contradictory answers to the authorities who initially investigated these crimes, some of which would render the conviction invalid if true. However, the Commonwealth offered a sensible explanation for these inconsistencies in that S.R. was unexpectedly called upon to repeatedly revisit the incidents with multiple people in a short timeframe and gave varying answers as a result of those circumstances.

Appellant also notes that when S.R. was asked when the first act of sex occurred, S.R. replied, "I believe I was still in ninth grade." He emphasizes the phrase "I believe" is proof of her uncertainty. Contrary to Appellant's interpretation, we do not read this prefatory remark as an admission that she was unsure as to when the sex occurred, as opposed to an inartful answer made under the stress of testifying in a courtroom setting. Furthermore, to the extent there is any ambiguity, the prosecutor immediately dispelled it by asking a follow-up question: "Okay. So you're still 15, right?" to which S.R. replied, "Yes." N.T., 7/16/14 (a.m. session), at 80.[2]

Appellant also attaches significance to the following exchange on redirect examination:

_____

[2] Appellant avers that we must discard such testimony as unreliable due to the "leading and objectionable question from the prosecutor." Appellant's brief at 12. However, Appellant did not object to the question or response.

Q. [S.R.], talking about this case, and everything, are you clear on the dates that any of this happened?

A. No.

Q. You talked today about you were 15 years when it started?

A. Yes.

Q. Are you certain you were 15 when you moved into the house on Phillip Street?

[APPELLANT]: Objection.

THE COURT: Overruled.

The witness: I don't remember.

N.T., 7/16/14 (p.m. session), at 49. He maintains that her negative answer proves she was uncertain regarding when any of these events occurred, and hence her testimony is unreliable as a matter of law.

We disagree. The first question posed, while perhaps poorly phrased, specifically asked S.R. if she remembered specific dates. Appellant reads this statement as if it stated, "Are you clear on the **years** that any of this happened?" Additionally, her lack of certainty regarding her age when she moved is not fatal. S.R. clearly testified that she moved in with her mother early in her freshman year of high school. S.R.'s birth month, October, is quite early in the normal school year. Thus, in context, S.R. simply professed that she was unsure whether she had already turned fifteen when she moved in with her mother.

Finally, we note that this trial occurred in July of 2014, over three years after the preliminary hearing which took place July 7, 2011. On cross-examination, Appellant confronted S.R. with a prior inconsistent statement given under oath at that proceeding in which she related that the abuse occurred sometime during the summer of 2009. In assessing the sufficiency of the evidence, we examine all of the evidence presented. Hence, while Appellant used this statement to generally discredit S.R., *i.e.*, by showing she gave multiple different versions of the events and was therefore not believable *en toto*, the fact remains that S.R. made a prior statement under oath much closer in time to the actual allegations. This statement firmly establishes that sex occurred well before October of 2009. We see no reason to ignore that statement when determining whether or not the evidence is so unreliable as to require discharge. **C.f. Commonwealth v. Brown**, 52 A.3d 1139 (Pa. 2012) (where witnesses to homicide recanted at trial, prior out-of-court statements reduced to writing and adopted by said witnesses were admissible as substantive evidence and therefore sufficient to convict).

That there are inconsistencies in S.R.'s account is unquestionable. We simply do not agree that these contradictions render her trial testimony so unreliable as a matter of law that it cannot be credited for sufficiency purposes. We therefore apply the normal method of review, and conclude that the jury was entitled to weigh all the testimony and credit or discredit

the inconsistencies as it saw fit. We have no license to reweigh its determinations, and we therefore must defer to its finding that S.R. was fifteen years old when the first act of sex occurred. Hence, we affirm the conviction.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2017