2024 PA Super 64

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| MARK ANTHONY ELLIS | : | |
| | : | |
| Appellant | : | No. 742 MDA 2023 |

Appeal from the Judgment of Sentence Entered November 14, 2019
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000516-2018

BEFORE:   PANELLA, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

OPINION BY KUNSELMAN, J.:                    **FILED: APRIL 2, 2024**

After a jury convicted Mark Anthony Ellis of murder of the first and second degrees and attempted robbery,[1] he appeals, *nunc pro tunc*, from the judgment of sentence imposing life in prison.  Ellis claims that the trial court violated the Fifth Amendment to the Constitution of the United States by ordering him to remove nonprescription eyeglasses that he wore during the trial.  Because the order did not compel Ellis to provide testimonial evidence, it did not implicate his Fifth Amendment right against self-incrimination, and we affirm.

On the morning of September 30, 2017, Debora Soder saw her .38 revolver where she always kept it, *i.e.*, inside her bedroom nightstand.  That evening, her daughter, Jessica Soder, brought Ellis, Jessica's then-boyfriend, to dinner.  However, Jessica introduced him by the alias of "Damien."  N.T.,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** Pa.C.S.A. 18 §§ 901(a), 2502(a)(b), and 3701(a)(1)(ii).

11/13/19, at 102. During dinner, the subject of conversation moved to Ms. Soder's .38 revolver. *See id.* at 105. The following morning, Ms. Soder realized her gun was missing. Jessica denied taking it.

Two-and-half-weeks later, on October 17, 2017, around 5:30 a.m., Ellis took Ms. Soder's .38 revolver to an Exxon gas station in York, PA. He used it to attempt a robbery. The station attendant, Aditya "Sunny" Anand, tried to run away, and Ellis shot and killed him. The Exxon's video surveillance system recorded the murder from three different angles. *See id.* at 139-40; *see also* Commonwealth's Ex. 14, 15, and 16.

Jessica and Tabitha Miller (another ex-girlfriend of Ellis) both identified Ellis as the shooter in the video. In particular, they recognized the "ugly, brownish-green coat" that Ellis wore. *Id.* at 252. Jessica also recognized Ellis' shoes, expensive Penny IV sneakers, in the video. *See* N.T., 11/14/19, at 272.

On October 27, 2017, Ellis and Jessica saw the York police investigating the murder scene from the window of their nearby, third-floor apartment. Ellis immediately shaved off his facial hair. He put the brownish-green coat from the video "in a garbage bag and threw it in a trash can down the block." *Id.* at 274. "And then he got rid of his [Penny IV] sneakers. He put them in a black plastic bag and threw them in . . . the Codorus Creek." *Id.*

Ellis also confessed to Jessica that he stole her mother's .38 revolver and "threw it over the Beaver Street Bridge," into the same creek. *Id.*

The police eventually arrested Ellis, and the matter proceeded to trial on January 7, 2019, but the jury was hung. The court declared a mistrial, and the Commonwealth retried Ellis in November 2019.

Ellis wore glasses at his second trial. Several Commonwealth witnesses "established that Ellis did not need glasses" and the Commonwealth moved for the court to "order him to remove the glasses . . . so the jury could observe him without glasses." Trial Court Opinion, 2/13/20, at 8. Defense counsel objected on that grounds that the motion "forced [Ellis] to give testimony against himself." N.T., 11/14/19, at 305.

The trial court overruled the objection, because ordering him to remove the glasses was "not testimony. It's like fingerprints are not testimony. DNA is not testimony. Blood." *Id.*

The jury convicted Ellis, and the trial court sentenced him as described above. Following a successful petition to reinstate his direct appellate rights under the Post-Conviction Relief Act,[2] this appeal followed.

Ellis raises two issues:

1.  Whether the evidence . . . was insufficient to prove that [Ellis] was the actor?

2.  Whether the trial court erred when it required . . . the removal of [Ellis'] eyeglasses in the presence of the jury which amounted to self-incriminating testimony of [Ellis] in violation of [his] right to remain silent?

Ellis' Brief at 4. We address each issue in turn.

---

[2] *See* 42 Pa.C.S.A. §§ 9541–9546.

*1.     The Sufficiency of the Evidence*

In his first issue, Ellis contends that the Commonwealth provided legally insufficient evidence to establish that he committed the charged crimes. This is an odd contention, given that Ellis concedes that Jessica and Ms. Miller both identified him "based on the [coat] and . . . sneakers worn by the person in the video surveillance" exhibits. *Id.* at 9. He also acknowledges that he is the same height as the person depicted in the video. *See id.* at 10. Yet, Ellis believes these facts "only prove that [he] owned a jacket and popular sneakers that were substantially similar to the [coat] and sneakers worn by [the murderer] at the time of the killing." *Id.* He is mistaken.

The legal sufficiency of the Commonwealth's evidence "is a question of law; our standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Murray***, 83 A.3d 137, 151 (Pa. 2013). We ask, "whether the evidence . . . admitted at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." ***Id.***

Critically, the Supreme Court of Pennsylvania has long held that "the Commonwealth need not prove its case directly. Circumstantial evidence can be as reliable and persuasive as eyewitness testimony." ***Commonwealth v. Paquette***, 301 A.2d 837, 839 (Pa. 1973) (citing ***Commonwealth v. New***, 47 A.2d 450 (Pa 1946), and 1 WIGMORE ON EVIDENCE § 26 (3d Ed. 1940)).

Here, the only people who witnessed the murder and attempted robbery in person were the victim and the murderer. However, the lack of a surviving

eyewitness does not prevent the Commonwealth from proving that Ellis was the murderer, as a matter of law. By offering the video and strong circumstantial evidence, the Commonwealth provided the jury with sufficient evidence to find Ellis guilty of the crimes beyond a reasonable doubt.

First, on the night that Ellis stole Ms. Soder's .38 revolver, Ellis and Jessica introduced him to Ms. Soder by the alias of "Damien." Second, Ellis owned the same type of coat and sneakers that the murderer in the surveillance video wore during the killing. He then disposed of that clothing after seeing the police investigating the crime scene. Third, Ellis admitted to Jessica that he stole Ms. Soder's .38 revolver and that he threw it in the creek following Mr. Anand's death. Fourth, Ellis shaved off his facial hair and wore glasses to trial (even though he did not need glasses) to alter his appearance from how he looked in the surveillance video.

When viewed in the light most favorable to the Commonwealth, all these acts were Ellis' attempts to hide his identity as the murderer and to escape conviction for his crimes. The jury did not have to ignore these acts, even though Ellis ignores them in his brief. Nor did the jury have to look upon them as mere coincidence, despite all evidence and common sense to the contrary.

Instead, the jury could rationally infer from Ellis' pre- and post-crime conduct that he possessed consciousness of his own guilt. In general, innocent people do not throw operable guns and expensive sneakers into creeks, nor do they change their appearances and names. Those are the acts of the guilty.

Lastly, Ms. Miller testified that she recognized Ellis in the video, because he was the same height and build as the man depicted therein. When the man in the video walked by height-measurement markings in a nearby convenience store, that store's video verified Ms. Miller's assessment that Ellis matched the height of the murder.

The jury was "free to believe all, part, or none of the evidence*."* ***Commonwealth v. Pruitt***, 951 A.2d 307, 313 (Pa. 2008). By believing the testimony of Jessica and Ms. Miller, the jury credited circumstantial evidence indicating that Ellis was indeed the man in the video who attempted to rob the Exxon station and murdered Mr. Anand.

We dismiss Ellis' first claim of error as meritless.

*2.     The Fifth Amendment & Nontestimonial Evidence*

Next, Ellis asserts that the trial court unconstitutionally ordered him to remove the nonprescription eyeglasses that he wore during trial. Ellis claims that he "invoked his right to remain silent under U.S. Const. amnd. V . . . and Article I, § 9 of the Constitution of Pennsylvania." Ellis' Brief at 13.

Preliminarily, we note that Ellis made no mention of the Pennsylvania constitution when objecting to the Commonwealth's eyeglasses-removal request. ***See*** N.T., 11/14/19, at 305. Thus, Ellis did not argue to the trial court that our state constitution affords him greater protections than the federal charter based on ***Commonwealth v. Edmunds***, 586 A.2d 887 (Pa. 1991). Accordingly, Ellis has waived any heightened protection under the Constitution of the Commonwealth of Pennsylvania. ***See*** Pa.R.A.P. 302(a).

- 6 -

As such, our analysis of the Pennsylvania constitution is coextensive with our analysis of the Fifth Amendment.

Regarding the Fifth Amendment, Ellis argues that the order to remove his nonprescription eyeglasses was "tantamount to compelling [him] to give **evidence** against himself . . . ." Ellis' Brief at 13 (emphasis added). He is correct. The trial court compelled Ellis to provide demonstrative and physical evidence against himself to the jury – *i.e.*, the image of his face free of glasses. However, Ellis implies that the Fifth Amendment prevented the trial court from ordering him to provide **any** evidence against himself. As we explain, his theory overextends the scope of the constitutional right.

The "admissibility or exclusion of evidence are subject to the abuse-of-discretion standard of review." **Hutchinson v. Verstraeten**, 304 A.3d 1268, 1273 (Pa. Super. 2023). "Abuse of discretion takes one of three forms." **Id.** at 1274. "It occurs if (1) the trial court committed an error of law; (2) the court exercised its judgment in a manifestly unreasonable manner; or (3) the court's decision was the result of partiality, prejudice, bias or ill-will, as shown by evidence on the record." **Id.** (some punctuation omitted).

Here, Ellis claims the order compelled him to provide evidence against himself and therefore violated the federal and state constitutions. He suggests the trial court abused its discretion by committing an error of constitutional law when it interpreted the Fifth Amendment and Article I, § 9 of the state constitution. We disagree.

When "reviewing a constitutional claim, we face a pure question of law, for which our standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Pi Delta Psi, Inc.***, 211 A.3d 875, 886 (Pa. Super. 2019), *appeal denied*, 221 A.3d 644 (Pa. 2019).

The Fifth Amendment dictates that "no person . . . shall be compelled in any criminal case to be a witness against himself . . . ."[3]  Similarly, the Pennsylvania constitution mandates, "In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself . . . ."  Pa. Const. art. I, § 9.

To understand the scope of the right against self-incrimination, we turn to its historical origins.  The right began as a maxim of Ancient Roman Law, "*nemo tenetur prodere seipsum*," that is, "no one is bound to betray oneself." Helmholz, *Origins of the Privilege against Self-Incrimination:  The Role of the European* Ius Commune, 65 N.Y.U. L. Rev. 962 n.1 (1990).  The privilege then passed into the Canon Law of the Catholic Church and became a point of contention in the ecclesiastical courts of Queen Elizabeth I (reigned 1558-1603).  ***See id.***  In the early years of the Protestant Reformation, subjects were bound to adhere to the religious beliefs of the Crown, which, in England, changed between Catholic and Protestant with the death of each, successive monarch.

---

[3] The Due Process Clause of the Fourteenth Amendment incorporates the Fifth Amendment right to remain silent against the States.  ***See Malloy v. Hogan***, 378 U.S. 1 (1964); ***see also Miranda v. Arizona***, 384 U.S. 436 (1966).

Elizabeth, a Protestant, charged her courts with compelling defendants to testify regarding whether they followed Catholic or Protestant teachings. The judges were to jail those who did not follow the Protestant creed. Because these ecclesiastical *corpora delicti* were spiritual in nature, there was little or no physical evidence of alleged crimes against the Church of England.

Thus, in the mid-1500s, defendants who invoked the ancient privilege against self-incrimination did not seek to shield physical or demonstrative evidence from disclosure. Instead, they refused to speak or to write their religious beliefs for the courts. When a defendant invoked the privilege, the question was "whether the defendant could be held *pro confesso*[4] for **refusing to answer an incriminating question** for which a proper foundation had been laid or whether he should instead be punished merely for contempt." **Id.** at 972 (emphasis added). Historically then, the right against self-incrimination was testimonial in nature.

Following the American Revolution, the scope of the privilege remained limited to testimonial evidence – namely, the spoken and written word.[5] For example, in **Holt v. United States**, 218 U.S. 245 (1910), a defendant sought to exclude evidence that a shirt belonged to him. A witness testified that Holt put it on, and "it fitted him." **Id.** at 252. Holt objected, because he was forced

---

[4] Latin, meaning "for I confess." At equity, the presumption was that, as a court of conscience, an equitable bill compelled a defendant to answer, and, if no answer came, the court could issue a decree *pro confesso* against him.

[5] Of course, refusal to speak may not be used as evidence of guilt. **See Griffin v. California**, 380 U.S. 609 (1965).

to put on the shirt under duress. In his view, the government had obtained the evidence in violation of his Fifth Amendment right against self-incrimination.

Rejecting that claim, the Supreme Court of the United States said Holt's theory amounted to "an extravagant extension of the 5th Amendment." *Id.* Writing for the unanimous Court, Justice Holmes explained, "the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of . . . compulsion **to extort communications from him**, not an exclusion of his body as evidence when it may be material." *Id.* at 252-53 (emphasis added).

The High Court declined to "consider how far a [district or trial] court would go in compelling a man to exhibit himself. For when he is [so] exhibited, whether voluntarily or by order . . . the evidence . . . is competent" under the Fifth Amendment. *Id.* at 523. Thus, **Holt** established that any nontestimonial displays of a defendant's person to the finder of fact do not implicate the right against self-incrimination.

More recently, this Court held, "inasmuch as demonstrative evidence is not testimonial it does not activate the right against self-incrimination." **Commonwealth v. Kenon**, 482 A.2d 611, 615 (Pa. Super. 1984) (concluding that an order compelling a defendant to try on a hoodie and jacket for the jury was nontestimonial evidence and did not implicate the Fifth Amendment). And, probably the most famous example of a defendant trying on an article of clothing for the jury is the case of **People v. Simpson**, No. BA097211 (Cal.

Super. Los Angeles 1995). There, the prosecution asked O.J. Simpson, who elected not to testify in his double-homicide trial, to try on a pair of bloody gloves in front of the jury. This demonstrative evidence was not a violation of Simpson's right against self-incrimination, because it was nontestimonial.

Like the articles of clothing that the defendants were forced to wear and display in **Holt**, **Kenon**, and **Simpson**, the nonprescription glasses that Ellis wore to his jury trial were nontestimonial evidence. He deliberately wore them to provide false evidence to the jury. Ellis hoped the glasses would hide his identity and make it more difficult for jurors to determine whether he was the murderer depicted in the surveillance video. Indeed, precisely as Justice Holmes predicted 114 years ago, Ellis' "objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph [or video] in proof." **Holt**, 218 U.S. at 253. The constitution does not require such a result. **See id.**

Taking Ellis' argument to its logical ends, criminal defendants might well decide to wear ski masks or paper bags over their heads at trials and refuse to remove them. If the Fifth Amendment:

> created inviolability not only for his physical control of his own vocal utterances, but also for his physical control in whatever form exercised, then it would be possible for a guilty person to shut himself up in his house, with all the tools and indicia of his crime, and defy the authority of the law to employ in evidence anything that might be obtained by forcibly overthrowing his possession and compelling the surrender of the evidential articles — a clear "*reductio ad absurdum*."

Wigmore, **supra**, § 2263 at 363. It would be equally absurd if a defendant could hide his face from the jury by wearing a disguise. The Fifth Amendment does not license a defendant to hide his face from the court.

By ordering Ellis to remove the nonprescription glasses, the trial court compelled him to provide nontestimonial evidence. Hence, the order did not implicate the right against self-incrimination as historically understood under the Fifth Amendment and our precedents. The trial court correctly applied the federal constitution when it overruled Ellis' objection and, therefore, did not abuse its discretion.

Ellis' second and final appellate issue warrants no relief.

Judgment of sentence affirmed.

PJE Panella joins.

Judge Colins concurs in result.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/02/2024